**CORONET FOODS, INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CORONET FOODS, INCORPORATED,**
Respondent.

Nos. 97–1087, 97–1247.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1997.

Decided Oct. 22, 1998.

**ARGUED:** Arthur B. Muchin, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, Illinois, for Petitioner. Fred Barry Jacob, National Labor Relations Board, Washington, D.C., for Respondent. **ON BRIEF:** Neil P. Stern, Robert T. Bernstein, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, Illinois, for Petitioner. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Supervisory Attorney, Meredith L. Jason, National Labor Relations Board, Washington, D.C., for Respondent.

Before WILKINS and MOTZ, Circuit Judges, and CAMPBELL, Senior Circuit Judge of the United States Court of Appeals for the First Circuit, sitting by designation.

Enforcement granted in part and denied in part by published opinion. Senior Judge CAMPBELL wrote the opinion, in which Judge WILKINS and Judge DIANA GRIBBON MOTZ joined.

## OPINION

LEVIN H. CAMPBELL, Senior Circuit Judge:

This appeal arises from a petition by Coronet Foods, Inc. ("Coronet") to review, and the cross-application of the National Labor Relations Board ("NLRB" or the "Board") to enforce, the NLRB's Second Supplemental Decision and Order issued against Coronet. The NLRB had earlier found, in proceedings enforced by the D.C. Circuit, that Coronet's replacement of its in-house transportation department with an outside contractor was in retaliation for its employees' union activities and constituted unfair labor practices. The NLRB then held a compliance proceeding resulting in orders that Coronet restore the abolished transportation department and pay backpay in specific amounts to illegally terminated employees. In this review petition Coronet contends that restoration will place an undue burden on Coronet, and that the backpay awards should be set aside as excessive and improperly computed.

### I.

Coronet is a West Virginia corporation with its principal place of business there. Its business consists of procuring, processing and cutting fresh vegetable produce like onions, peppers, cucumbers, radishes and lettuce to its customers' specifications. Its customers include fast food chains like McDonald's and Domino's. Part of Coronet's services include trucking the finished product to its customers' distribution centers over long distances, providing deliveries on a 24–hour seven-days-a-week basis. Because the products are perishable, fast and on-time deliveries are essential. Prior to 1989, Coronet owned and operated its own trucks and

trailers, using its own drivers and mechanics, within a so-called transportation department. Its vehicles then included 11 tractors, 13 trailers and 6 or 7 "straight" trucks.

In 1987, employees in Coronet's in-house transportation department sought to join the local chapter of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (the "Union"). Coronet's management responded, as later found by the NLRB, *infra*, by threatening to close the department if it unionized. Transportation department employees nonetheless voted, in April 1988, to join the Union. Soon afterwards, Coronet laid off six of the department's employees and discharged one more who had participated in union activities. In May 1989, Coronet shut down its transportation department, laid off the mechanics and drivers within the department, and contracted with Ryder, an outside trucking company, to fulfill its transportation and delivery requirements.

Coronet's closure of the department and related actions were challenged before the NLRB as being in retaliation for its employees' union affiliation. Coronet responded, in defense, that its in-house trucking operation was inefficient and outmoded, and that its vice-president, Thomas Padden, who was hired in 1986, had made a business judgment to replace it with an outside operator. According to Coronet, unionization concerns were not the primary reason it had eliminated the department.

On March 22, 1990, an Administrative Law Judge ("ALJ") found that Coronet had violated § 8(a)(1) of the National Labor Relations Act ("NLRA")[1] by threatening to close the transportation department if the employees unionized and by giving the impression that management was conducting surveillance of the employees' efforts to unionize. *See Coronet Foods, Inc.*, 305 N.L.R.B. 79, 1991 WL 203802, at *6–*10 (1991) (ALJ decision). The ALJ also concluded that Coronet had violated NLRA §§ 8(a)(3)[2] and (1) by closing its

---

**1.** Section 8(a)(1) states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section 157 of this title." 29 U.S.C. § 158(a)(1) (1973).

**2.** Section 8(a)(3) provides, in relevant part, that it is unfair for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage

transportation department and by laying off and discharging employees who supported the Union. *See id.* at \*11–\*19. Coronet's failure to negotiate with the Union regarding the department closing was held to violate NLRA §§ 8(a)(5)[3] and (1). *See id.* at \*19–\*21.

Although the ALJ found credible Padden's testimony that he wished Coronet to get out of the trucking business as early as 1986 for legitimate business reasons, the ALJ determined that it was only in 1989, after unionization became an issue, that Coronet decided to close the in-house operation. The ALJ also found that the company's owner and founder, Edward Long, not Padden, had the authority to make the closure decision; that Long authorized the purchase of new trucks in 1987; and that it was only when the union appeared that closure was ordered.

For relief, the ALJ recommended that Coronet be ordered to restore the transportation department and reinstate with backpay the employees it had laid off and discharged. *See id.* at \*21–\*22. The ALJ found no evidence in the record that "resumption of[Coronet's] transportation operations would cause it undue hardship." *Id.* at \*26. The ALJ's recommendations were adopted in September 1991, with only minor alterations by the NLRB's three-member panel. *See id.* at \*1–\*2 (panel decision). The panel's order was reviewed and enforced by the United States Court of Appeals for the District of Columbia. *See Coronet Foods, Inc. v. NLRB*, 981 F.2d 1284 (D.C.Cir.1993). In its opinion, the Court of Appeals stated that Coronet "utterly failed to carry" its burden of production and persuasion on its defense that restoration of the transportation department would cause an undue burden on the company. *Id.* at 1288.[4]

The NLRB's General Counsel then instituted the compliance proceedings now before us. These were undertaken to consider further Coronet's objections to the NLRB's restoration order and to determine the amount of backpay due. On February 10, 1994, the NLRB's Regional Director for Region Six issued a compliance specification that set out the amount of backpay owed by Coronet to each terminated employee. In its answer, Coronet contested the various remedies. First, it asserted that the NLRB failed to toll backpay as of the date that Coronet would have laid off the employees for nondiscriminatory reasons. Second, it alleged that the NLRB was using the incorrect backpay formula. Third, it contended that restoration of its transportation department would impose an undue burden upon Coronet.

An ALJ held an eight-day hearing and, on April 19, 1996, issued a supplemental decision in which he found for the NLRB, with only minor exceptions. *See Coronet Foods, Inc.*, 322 N.L.R.B. 837, 1997 WL 11274, at \*4 (1997) (ALJ's supplemental decision). While the Board had ordered restoration in the original unfair labor practice proceeding and the D.C. Circuit had rejected the undue burden defense, *supra*, both the D.C. Circuit and the Board acknowledged that the restoration order could be further litigated in the compliance proceeding, and this occurred, resulting in the ALJ's reaffirmation that Coronet must restore its in-house transportation department. *See id.* at \*4–\*5. The ALJ found insufficient support for Coronet's claim that resuscitating the department would cause undue hardship. *See id.* The ALJ also found that the General Counsel had used the correct backpay formula. *See id.* at \*7–\*8. The ALJ tolled a few backpay awards for times during which particular employees had been unavailable for work, had failed to engage in a reasonably diligent search for work, or had

---

or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

**3.** Section 8(a)(5) states that it is unlawful for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

**4.** The Regional Director applied to a federal district court for a temporary injunction pending the Board's final decision. The court denied a

temporary restoration order, finding that reestablishment of the trucking department "would create such a financial hardship on [Coronet] that it would jeopardize the existence of the business and the jobs of the other employees remaining on the payroll." *Zawatski v. Coronet Foods, Inc.*, No. 89–0042–W(K) (N.D.W.Va. Dec. 27, 1989). The D.C. Circuit noted that the district court's opinion did not state the evidence upon which the court based its undue burden finding. *Coronet Foods*, 981 F.2d at 1286 n. 3.

been employed part-time, but rejected most of Coronet's objections to individual claimant's backpay figures. *See id.* at \*8–\*16. The NLRB's three-member panel subsequently issued its Second Supplemental Decision and Order, in which it adopted the ALJ's conclusions and recommended order, with minor exceptions.[5] *See id.* at \*1–\*2. Coronet seeks review of, and the NLRB seeks to enforce, the NLRB's Second Supplemental Decision and Order dated January 10, 1997.

## II.

Coronet concedes, as it must, the finality of the Board's 1991 unfair labor practice decision, enforced in 1993 by the D.C. Circuit. That decision held that Coronet's closure of its transportation department in 1989, and its discharge of drivers and mechanics in that department, were illegal. Restoration of the department and backpay were also ordered at that time. However, the D.C. Circuit and Board acknowledged that these remedy issues would remain for reconsideration in the subsequent compliance proceedings now under review. We accordingly focus in this opinion solely on remedy.

We turn first to the propriety of the Board's order that Coronet restore its in-house transportation department rather than continue to contract for trucking services as it has been doing since 1989. Coronet initially contracted with a national provider of trucking services, Ryder, in May of 1989. A year later it became briefly involved with a trucking contractor known as TCC. Coronet canceled that arrangement in favor of LMI, the contractor it has since engaged, with complete satisfaction, for its trucking needs.

### A. *Standard of Review*

While we shall return later to some of the specific case law, it is helpful to review at the outset some of the guiding standards. We start with the fact that the NLRB has broad but not unlimited authority under NLRA § 10(c) to remedy unfair labor practices. *See NLRB v. Seven–Up Bottling Co.*,

344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *see also Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 258 (4th Cir.1994). We must enforce the Board's chosen remedy unless it is "arbitrary, capricious, or manifestly contrary to the statute," *Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 82 (4th Cir.1996).

The Board is expressly authorized by statute to order the reinstatement of improperly discharged workers and to award backpay. 29 U.S.C. § 160(c). In addition, the Supreme Court has held that the Board may, in an appropriate case, order an employer to restore a department closed as the result of anti-union animus. *See Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 215–17, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). When an employer closes a department in retaliation for its employees' union activities, an order mandating restoration of the department is presumptively appropriate and should be overturned only if the employer shows that restoration would either impose "an undue or unfair burden on it," *Fibreboard*, 379 U.S. at 216, 85 S.Ct. 398, or threaten its viability as a company. *See Power, Inc. v. NLRB*, 40 F.3d 409, 425 (D.C.Cir.1994); *Mid–South Bottling Co. v. NLRB*, 876 F.2d 458, 461 (5th Cir.1989). While restoration is presumptively appropriate, however, the question of remedy is "closely tied to the facts of each case" and "[n]o per se rule can be stated." *Mid–South Bottling Co.*, 876 F.2d at 460.

It is the employer's burden to demonstrate the affirmative defense of undue hardship, *Woodline Motor Freight, Inc. v. NLRB*, 843 F.2d 285, 291 (8th Cir.1988), and the employer must, as with any affirmative defense, demonstrate undue hardship by a "preponderance of the evidence." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). The NLRB's findings of fact must stand if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). And it has been held by the

---

5. The NLRB severed two issues and remanded them to the ALJ for further action. Those issues have no bearing on this appeal.

Supreme Court that the Board's choice of remedy, resting on the Board's "fund of knowledge all its own," must be given special respect by reviewing courts. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ While the "substantial evidence" standard requires that we give due deference to the Board's findings, "it does not follow ... that the findings of the [Board] are to be mechanically accepted." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir.1969). "Rather, we are obligated to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." *NLRB v. Consolidated Diesel Elec. Co.*, 469 F.2d 1016, 1021 (4th Cir.1972); *see also NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) (reviewing courts are not "to stand aside and rubber stamp" Board determinations that are contrary to the tenor of the Act).

■ While we may not "lightly substitute [our] own judgment on 'how to best undo the effects of unfair labor practices,'" *NLRB v. Sandpiper Convalescent Ctr.*, 824 F.2d 318, 323 (4th Cir.1987) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 899, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984)), we must ensure that the Board's findings "are not based on speculation or suspicion, as these register no weight on the substantial evidence scale." *NLRB v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1269 (4th Cir.1994) (*citing NLRB v. Instrument Corp. of Am.*, 714 F.2d 324, 328 (4th Cir.1983)). As the Supreme Court has stated:

> Congress has ... made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Courts enforce remedial orders that are

based upon the Board's careful consideration of the factual circumstances and the Board's special competence in fashioning appropriate remedies. As the D.C. Circuit has explained:

> A remedial order should recognize the competing considerations which are potentially affected by the remedy chosen, be grounded in factual determinations rather than speculation, and explain how, in light of present circumstances its remedy can be expected to effectuate the purposes of the Act.

*Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 45 (D.C.Cir.1980).

We turn next to an outline of the record evidence relating to Coronet's undue burden argument and the reasoning underlying the ALJ's decision to uphold restoration.

### B. *Coronet's Undue Burden Contention*

Coronet did not furnish financial data showing that restoration would impose higher costs than contracting does. Nor has Coronet shown that it is in a precarious financial position making it unable to withstand the costs of restoration, whatever they are. Hence Coronet has not established that restoration will cause undue hardship because of cost per se.

Coronet makes a different sort of undue hardship argument. It contends that restoration will cause undue hardship by forcing it to forego contract trucking services, standard in its industry, that now fully meet its needs and satisfy its customers, replacing them with the problematic services of an untested, in-house alternative that it must construct from whole cloth. The record demonstrates that Coronet's last in-house transportation department, closed in 1989, was plagued with problems. Coronet has presented the testimony of two witnesses—Coronet's president, Thomas Padden and William Jaquith,[6] an expert transportation consultant, both uncontradicted in the record and both credited by the ALJs, that Coronet lacks the experience and expertise to run a satisfactory in-house trucking service.

---

6. Jaquith had very strong qualifications and experience, and was, moreover, the only transportation expert who testified. The Board itself presented no independent evidence on the practicalities and effect of restoration.

### 1. *Testimony of William Jaquith*

William Jaquith testified that Coronet's former in-house transportation department had been poorly operated. Jaquith testified that Coronet had poor record-keeping and regulatory compliance procedures, frequent breakdowns with no long-term arrangement for service, insufficient garage space for a truck fleet, inadequate expertise to maintain equipment, and an aging fleet. Jaquith described the condition of Coronet's fleet in 1989 as comparable to fleets that existed in the 1950s and 1960s. According to Jaquith, Coronet's poor recordkeeping, sloppy maintenance, and overall lack of expertise and experience in operating a trucking department resulted in an operation that was wholly inefficient. Indeed, as to Coronet's trucking talents, Jaquith stated bluntly: "They are not good truckers. They're not even mediocre truckers."

Hence, according to Jaquith, if Coronet wished to resume its in-house department today it would have to structure it in a much different, more sophisticated, way. To operate a private fleet, Jaquith testified that Coronet would have to retain a transportation consultant; terminate the contract with LMI; and replacing LMI's services by: (a) negotiating for equipment (trucks, tractors and trailers) with a national leasing firm such as Penske; (b) securing a source for fuel and emergency breakdown service; (c) hiring a transportation management team; (d) acquiring insurance; (e) instituting driver training and drug testing; (f) purchasing a computer system comparable to LMI's (for record-keeping) to control costs; (g) locating a terminal; and (h) arranging for a back-up carrier to prevent service failures during the six-month transition period; and (i) hiring management personnel to run its private fleet, including a general manager, terminal manager, clerk and several dispatchers.[7]

Even if all these innovations and improvements could be realized, however, Jaquith opined that Coronet should not resume operation of its private fleet. He testified that Coronet's in-house transportation department was structured in a now-obsolete manner. As a private operator, Jaquith testified that Coronet lacked the necessary regulatory authority to develop "backhauls"—loads that fill the otherwise empty miles back from where a truck has made its delivery. Jaquith testified that companies had not operated in this manner for decades:

> The fleet as it operated in those days was typical of what we found in the '60's and '70's; it was being run in a private fleet one way with finished product and came back empty. You can't do that any more and stay competitive.

Jaquith testified that a resumption of Coronet's private fleet operation would "penalize them to the tune of about $460,000, because that's what the backhaul credits ... amount to right now." [8]

Jaquith opined that dedicated carriers, which have the necessary approvals to engage in backhauls, could make the company a better deal financially. He concluded that it would simply make no sense for Coronet to revert to its previous private fleet operation with no backhauls. Such fleets, he said, "are basically being eliminated all over the country." Jaquith testified that private fleets "may have made some sense in the days of regulation, when the opposing carrier rates were $3 to $4 a mile. They don't now, when a dedicated fleet can come in at a price these people do."

Jaquith testified that in order to develop backhaul business and remain competitive, Coronet would have to operate as a common carrier. To do this, it would have to both take all of the above steps necessary to run a private fleet and also apply for interstate and intrastate operating authorities, and workers'

---

7. By 1993, Coronet's trucking operation had expanded considerably. Jaquith testified that in 1989 Coronet used only 11 tractors and 13 trailers. By 1993, those numbers had doubled—Coronet utilized 22 tractors and 25–30 trailers. Similarly, the number of drivers in Coronet's transportation department more than doubled from 16 in 1989 to between 36 and 40 in 1993.

8. Jaquith testified that Coronet receives a dollar-for-dollar credit from LMI for all backhaul business, which it properly reports as revenue on its profit and loss statement.

compensation insurance, and obtain a sales-oriented general manager to solicit backhaul traffic. Jaquith further testified that accounting and regulatory requirements would also necessitate some corporate restructuring; he stated that Coronet would have to create a separate division or corporate subsidiary for the trucking operation. Jaquith testified that the transition to common carrier status would take approximately six months. During that time, Jaquith opined that, even with a back-up fleet, Coronet risked a "substantial service failure" due to late deliveries of its perishable products. He noted that Coronet's contracts with customers were on a "handshake basis"—in other words, they could be terminated at any time, for any reason.[9]

Jaquith testified that Coronet did not have the expertise or experience to run a common carrier operation. To do so, Jaquith testified, Coronet "will in essence have to go into the motor carrier business, which is a different business than their primary business, which is processing salads and lettuce." He testified that if Coronet terminated the contract with LMI and attempted to operate as a common carrier, it would be unable to maintain the bulk of the backhaul business generated by LMI. Based upon his review of Coronet's trucking operations and its present, successful, arrangement with LMI, Jaquith opined that there was no logical business reason for Coronet to go back into the trucking business, and that if it had to do so,

> I'd recommend they get out of that business as quickly as they can.... They should not be in that business.

Jaquith testified that shortcomings similar to those he found in Coronet's in-house department had caused two-thirds of the twenty-five companies with which he has consulted in the last decade to convert to a contract fleet rather than attempt to operate their own, sophisticated, fleets. According to Jaquith, those companies that did not contract were local companies (rather than long-distance carriers like Coronet) providing special services beyond just trucking, calling for special arrangements that were best performed by their own trained personnel. Thus, according to Jaquith, the trend in the industry in 1989, if not before, was for companies to enter full-service contracts with carriers like Ryder and LMI for their shipping needs.

Jaquith noted that under the Ryder and LMI contracts, Coronet had increased its trucking efficiency by approximately fifty percent. He testified that common carriers like Ryder and LMI operate using the latest technology for specifications, engineering, preventive maintenance, repair, disposition patterns, fuel use, and so on. In addition, Jaquith testified, these common carriers have detailed records regarding the costs and efficiency of their fleets, and are in a position superior to that of private fleets to develop backhauls with "sister" or "cousin" operations. Unlike Coronet's old department, moreover, which relied upon truck stops to repair disabled trucks, Jaquith testified that Ryder and LMI have garage networks that allow trucks to be repaired and back in service within an hour. Jaquith also pointed out that Ryder and LMI have established locations throughout the country where drivers can rest after driving their maximum number of hours.

Jaquith testified that today's truck fleets are leased, not owned, and were not serviced by in-house mechanics as had been Coronet's practice prior to 1989. Under the leases, the lessor provides the fuel, servicing, and so on—indeed, Jaquith testified that the lessor will *insist* on servicing the vehicles. Thus, whether as a private fleet or common carrier, Coronet could lease its trucks, but it would not be in a position to hire in-house mechanics to service and maintain a leased fleet.

### 2. Testimony of Thomas Padden

Padden came to Coronet in 1986 after considerable experience at McDonald's. He was promoted from Vice–President to President and General Manager in 1990. According to the ALJ in the unfair labor practices proceeding, Padden presented "credible evidence that Coronet's transportation depart-

---

**9.** In fact, Jaquith noted that a substantial customer, Kentucky Fried Chicken, had terminated its contract with Coronet in 1992 or 1993 without notice, because it decided to contract for a wet slaw instead of the dry produce provided by Coronet.

ment had long been troubled by problems and shortcomings which the full-service transportation system provided by Ryder could serve to remedy." Specifically, Padden mentioned (1) an inadequate and aging fleet of trucks, (2) inefficient record-keeping involving fuel, permits and federal and state regulatory requirements, (3) safety program deficiencies, (4) maintenance and on-the-road breakdown problems, (5) inadequate garage and parking facilities, (6) routing, and (7) parts inventory problems.

Padden testified that, based upon the foregoing problems and others, he came to the conclusion in 1986 that Coronet should not be in the distribution business. The ALJ in the unfair labor practice proceeding stated that he believed Padden's testimony that he (Padden) concluded prior to 1989 that Coronet should get out of the distribution [trucking] business. The ALJ in the instant compliance proceeding likewise credited the sincerity of Padden's belief on this score ("... I credit absolutely Padden's statement of his intention to eliminate Respondent's in-house transportation department....").[10]

Padden testified that he was made president of Coronet in 1990 because Howard Long had been asked by McDonald's to become involved with certain foreign operations, and hence had to spend much of his time abroad. Padden testified that once he was elevated to president of the company, he was solely in charge of decisions relating to the method Coronet used to transport its product. Padden stated that as of January 1990 he no longer needed approval from Long or anyone else to subcontract for trucking services. The ALJ found Padden's testimony on this issue credible.[11]

Padden testified that he believed that the same problems with the transportation department he had outlined at the unfair labor practice hearing would have existed had it still been operating in 1993. He believed

that "nothing would have changed for the better." He continued,

> My opinion is based on the fact that what we do and do best is further process produce. What we don't do best is run a trucking operation.

Accordingly, Padden said he would have "moved[the trucking department] out" after he became president in 1990 [had it still been going], replacing it with a skilled transportation company that could bring a "total package" to Coronet.

Padden gave various reasons for preferring a contract operation. He mentioned safety concerns and potential criminal liability of executive officers for safety violations. He testified that he and his people lacked expertise and experience in trucking operations. He mentioned, as did Jaquith, the litany of separate operations necessary to put together a smooth-running transportation department and the desirability of a contractor who provided and managed the "total package," freeing Coronet's management from that responsibility. Padden testified that, before he became president, he spent forty percent of his time dealing with transportation issues; after Ryder took over, Padden testified that he spent only five percent of his time on such issues.

Padden pointed out in his testimony that when Coronet briefly experienced problems in 1991 with a contractor whom they quickly replaced, Padden chose not to go back to an in-house operation because "we didn't do it right the first time, we certainly are not in any shape to do it right the second time." Padden said he wanted "someone who had some expertise." Otherwise, he continued,

> We're back to square one.... [I]f we were to again try to do our own fleet program, I'm going to have to hire people with that area of expertise. I'm back in the same throes of we need systems, we

---

10. While both ALJs credited Padden's testimony about his actions and intentions, they rejected these as the true reasons for the 1989 shutdown of the department. Rather, they attributed the shutdown decision to Padden's superior, Howard Long, Coronet's founder and sole stockholder, who acted only when unionization became an issue.

11. Indeed, the ALJ found that Padden had provided detailed testimony, some of which the ALJ deemed to be against Coronet's interests. Accordingly, the ALJ generally credited Padden's testimony in the enforcement proceeding.

need software programs, we need probably special equipment to take care of tractor trailers. We need a facility to be able to take care of the equipment. We need somebody that's going to be very good in recordkeeping.

Padden credited Ryder and LMI with developing Coronet's backhaul business. He testified that backhaul revenues are essential to Coronet's business because they allow Coronet to offer its product to customers at a lower cost, thus generating company goodwill. Padden described, for example, how LMI called to his attention a firm that needed to deliver records to California from Pennsylvania, and helped coordinate use for this purpose of the same trailers employed for Coronet's lettuce shipments. While Padden testified that he had some experience working with McDonald's to develop backhauls,[12] he testified repeatedly that he considered it essential that Coronet hire a full-time general manager with marketing and sales experience to handle the backhaul business.

Padden testified that Coronet was completely satisfied with the services provided by LMI. In addition to backhaul business, Padden credited LMI for other innovations that have resulted in increased efficiency. For example, Padden noted that LMI had created a domicile in Plainville, Connecticut, enabling drivers from Wheeling to be replaced there so as to avoid hours violations and speed up running time to Massachusetts.

Padden testified that once a general manager was hired to run the transportation department, assuming one could be found in the area and for the right salary, there would be some delay as that employee became familiar with Coronet's operation.[13] Padden expressed concern that Coronet might lose some or all of its business during this transition period and noted, as had Jaquith, that Coronet's contracts with its customers were on a "handshake basis." In addition to this delay, Padden testified that it was uncertain whether Coronet could quickly obtain the

specialized tractor-trailers needed to ship its produce. While LMI might sell or lease some of these trailers to Coronet, Padden noted that LMI was not contractually obligated to do so. Thus, Padden expressed some doubt that Coronet could simply take over where LMI left off if the contract was terminated.

## C. *The ALJ's Decision*

The Board rested its decision and order on ALJ Steven M. Charno's articulate supplemental decision issued on April 19, 1996 after a lengthy hearing in the summer of 1995. ALJ Charno reconsidered and upheld the earlier restoration order issued at the time of the unfair labor practice finding. He rejected Coronet's affirmative defense of undue burden.

The ALJ, relying heavily on Jaquith's testimony, found that Coronet could readily reinstate its transportation department either by operating a private fleet or establishing a common carrier operation. The ALJ further found that all of the steps required for Coronet to operate a trucking department—either as a private operator or a common carrier—could be accomplished without undue "costs and problems."

In reaching his conclusion, the ALJ focused narrowly on cost considerations, noting that he had "been unable to locate any authorities" analyzing the undue burden defense that did not focus primarily on out-of-pocket costs which had to be incurred in connection with restoration. *Coronet Foods, Inc.*, 1997 WL 11274, *5 n. 13. The ALJ noted that Coronet's current contract with LMI was "cost plus," meaning that Coronet already pays LMI's costs for equipment leasing, fuel, emergency expenses, salaries and benefits of management (terminal manager, dispatcher, and clerical personnel), driver training and testing expenses, terminal rental and insurance costs. According to the ALJ, the record contained no evidence that Coronet itself could not obtain these same

---

12. Padden testified that the McDonald's backhauls accounted for approximately 50% of Coronet's total backhaul revenues.

13. Lawrence Donahue, President of LMI, testified that it would take a general manager approximately two years to become familiar with Coronet's new operation.

items from suppliers or similar sources, or that Coronet's costs for them would exceed the amount now paid to LMI. In addition, according to the ALJ, a computer system could be purchased for $100,000 to $120,000.

The ALJ concluded that the economic benefits flowing from the shutdown of the department and the termination of the LMI contract outweighed the out-of-pocket costs to Coronet of restoring the department. He estimated that Coronet realized a taxable gain of $332,000 when it sold its fleet in 1989 and would save $300,000 a year when it no longer had to pay, as currently required, a twelve percent profit margin to LMI. These amounts, in the ALJ's judgment, significantly outweighed Coronet's costs of acquiring interstate and intrastate operating authority, a computer system, a transportation consultant, and a transportation-oriented general manager. Even, moreover, if the costs of reestablishment exceeded these benefits, the ALJ found that "the absence of any evidence of Respondent's total worth or of the size or profitability of its operations makes it impossible to determine whether those costs would constitute an undue burden." Hence the ALJ held that Coronet had not met its burden of showing that the problems and costs of reinstatement impose an undue burden on Coronet.

As part of these findings, the ALJ also determined, contrary to Jaquith's expert testimony, that Coronet would not lose any of its backhaul traffic when it terminated its contract with LMI and would not need to hire an expensive ($150,000 a year) sales-oriented general manager. According to the ALJ, Padden had testified that he had in the past arranged for "virtually all of [Coronet's] backhaul traffic." The ALJ concluded that Padden could simply resume this responsibility, thus maintaining Coronet's backhaul revenues and obviating the need for an expensive general manager.

### D. Conclusions as to Restoration

■ Having reviewed the record evidence concerning Coronet's undue burden defense and the basis for the ALJ's rejection of that defense, we next examine the propriety·of the restoration order in light of the case law, keeping in mind our obligation to "scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the Board." *Consolidated Diesel Elec. Co.,* 469 F.2d at 1021.

### 1. Relevant Precedents

Departmental restoration orders "trench[ ] ... closely upon otherwise legitimate employer prerogatives." *Textile Workers of Am. v. Darlington Mfg. Co.,* 380 U.S. 263, 276, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Such orders involve a difficult choice between an employer's right to structure its business pursuant to its best judgment and the Board's right to insist upon a meaningful remedy for disregard of the labor laws.

Courts have refused to enforce restoration orders found to cause the employer to suffer an undue burden. In some cases, the undue burden has consisted of costs and capital investments necessitated by restoration. *See, e.g., NLRB v. R & H Masonry Supply, Inc.,* 627 F.2d 1013, 1014 (9th Cir.1980) (denying restoration of a trucking department because it would require a "substantial capital outlay" from a small company with a minimal profit margin); *Frito–Lay, Inc. v. NLRB,* 585 F.2d 62, 68 (3d Cir.1978) (restoration inappropriate where reopening of uneconomic plant would cost one million dollars plus operating loss of several hundred thousand dollars a year); *NLRB v. Am. Mfg. Co.,* 351 F.2d 74, 80 (5th Cir.1965) (no restoration where employer required to purchase "a new fleet of unwanted trucks"); *NLRB v. New England Web, Inc.,* 309 F.2d 696, 701–02 (1st Cir.1962) (no restoration where employer in serious financial distress).

Courts have also refused to enforce restoration orders where considerations other than cost have militated against the resumption of operations. *See, e.g., Jays Foods, Inc. v. NLRB,* 573 F.2d 438, 446–47 (7th Cir.1978) (although company was financially sound and restoration would not cause revenue losses, restoration of trucking operation refused because it might impose unwarranted hardship on third party to whom discontinued work had been contracted); *NLRB v. Savoy Laundry, Inc.,* 327 F.2d 370, 372 (2d Cir. 1964) (restoration held "unduly harsh" where

employer had not engaged in discontinued business for three years and had lost patronage of customers and goodwill in interim); *see also Statler Indus., Inc. v. NLRB,* 644 F.2d 902, 910 (1st Cir.1981) (listing, among other considerations, disadvantaging the very employees affected by the closure, "the lapse of a long period of time prior to resumption," and the making whole of injured employees through other means).

Courts have held that, while cost considerations are an important factor in determining whether a restoration order is appropriate, the more general business practicalities of the situation must be taken into account. *See, e.g., Great Chinese Am. Sewing Co. v. NLRB,* 578 F.2d 251, 256 (9th Cir.1978) (holding Board's failure to order restoration of sewing plant was not abuse of discretion in light of trend in garment industry to subcontract sewing work to low-cost foreign companies); *Savoy Laundry, supra,* 327 F.2d at 372 (refusing to enforce restoration of wholesale shirt division where small, family-owned and operated laundry had not engaged in this phase of laundry business for three years and had lost good will and patronage in interim).

In fashioning remedies, the Board too has been mindful that the remedy should "be adapted to the situation that calls for redress." *NLRB v. Mackay Radio & Tel. Co.,* 304 U.S. 333, 348, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Thus, in fashioning remedies the Board has sought to take into account practical business considerations relating to the parties involved. *See, e.g., Roytype Division,* 298 N.L.R.B. 609, 1990 WL 122434, *1 (refusing restoration in light of, among other things, "long passage of time since the initial relocation" and prospect that employer would face renewal of environmental problems); *Summit Tooling Co.,* 195 N.L.R.B. No. 91, 1972 WL 4304, *3 (1972) (noting that "practical considerations," such as nature of tool design business and "the possibility that the discontinued operation may now be outmoded" militate against restoration), *enforced NLRB v. Summit Tooling Co.,* 474 F.2d 1352 (7th Cir.1973).

■ The law is also clear that, for evaluating a restoration order, these business and other practicalities need not be judged solely as of the date of the unfair labor practices (occurring here in 1989), but may also be judged on the basis of evidence presented to the Board of subsequent relevant economic and other factors. *See Great Chinese Am. Sewing Co.,* 578 F.2d at 256 (noting post-closing trend in garment industry to subcontract work); *see also Roytype Division,* 1990 WL 122434, at *1 (citing the "long passage of time since the initial relocation" and the changing nature of employer's business). Here, the ALJ received evidence relevant to the effects of restoration on Coronet, through September, 1993, but refused to receive any evidence from a later period. The parties do not now dispute this cut-off date.

## 2. *The Propriety of the Restoration Order*

■ We recognize that Coronet committed an unfair labor practice when it abandoned its former transportation department in the circumstances then existing. We do not doubt the Board's authority to order restoration of a department closed for illegal reasons. But while restoration of the status quo is often an appropriate remedy, it is inappropriate if it causes undue hardship. The regulatory scheme established for labor relations by Congress is "essentially remedial," and the Board is not authorized to impose penalties solely for the purpose of deterrence or retribution. *Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10–12, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

■ While we find this a close and difficult case, based upon our review of the record as a whole we do not believe that the Board's restoration order serves the remedial purposes of the NLRA. We conclude that a restoration order under these circumstances would place an undue burden on Coronet and would be punitive rather than remedial. Accordingly, for the reasons that follow, we conclude that the Board abused its discretion in ordering restoration of Coronet's transportation department.

In rejecting Coronet's undue burden defense, the ALJ focused exclusively on the costs and benefits, in dollar terms, associated with restoration. The ALJ's cost-benefit ap-

proach was far too narrow. While it is certainly true that courts reviewing restoration orders have assessed the financial burdens associated with a resumption of operations, they have also scrutinized the operational problems and other business considerations such orders entail. Thus, for example, the Ninth Circuit in *Great Chinese Am. Sewing Co.* emphasized the fact that industry trends favored subcontracting sewing work to overseas outfits in refusing to enforce an order restoring a sewing facility. 578 F.2d at 256. The court concluded that forcing the employer to reinstitute its sewing facility would place it "at a competitive disadvantage within its industry." *Id.* Similarly, in *Savoy Laundry,* the Second Circuit refused to enforce a restoration order in part because the employer had not engaged in the business at issue for three years and had suffered a loss of goodwill in the interim. 327 F.2d at 372. Neither has the Board confined itself solely to a balance sheet approach, considering instead the practicalities of each situation, including whether the closed operation is now outmoded or obsolete. *See Roytype,* 1990 WL 122434, at *1; *Summit Tooling,* 1972 WL 4304, at *3.

Coronet presented uncontradicted testimony from Jaquith and Padden concerning the practical effects of forcing Coronet back into the trucking business as a private fleet. The uncontradicted record evidence showed that resumption of Coronet's private fleet, which was described by Jaquith as not even "mediocre," would not only be a bad business decision, but would also place the company at substantial risk. Without the ability to engage in backhaul business, Jaquith testified, Coronet could not remain competitive in its industry. Thus, the ALJ had before him uncontradicted evidence that a private fleet operation of the type Coronet utilized at the time of the shutdown was an outmoded and inefficient structure for Coronet's business.

To retain the significant backhaul revenues, which Jaquith estimated to be approximately a half million dollars per year, Jaquith testified that Coronet would have to operate as a common carrier. To order Coronet to do so, Jaquith and Padden both testified, would essentially force Coronet to enter a business that it had demonstrated no aptitude whatsoever for in the past. Contrary to the ALJ's finding that Coronet did not risk losing *any* backhaul business during the transition to common carrier status, Jaquith's uncontradicted testimony was that Coronet would likely lose *all* of that business. And, contrary to the ALJ's finding that Padden had handled "virtually all" Coronet's backhaul business in the past, Padden's uncontradicted testimony was that he had, for a short period of time, helped broker approximately *half* of Coronet's backhaul revenues. Padden also testified that after 1989 he spent only five percent of his time on transportation matters, and that if forced to restore the transportation department in any form, he would seek the services of a general manager skilled in sales and marketing to handle the development and maintenance of Coronet's backhaul business.

The ALJ's conclusion that restoration was a relatively easy and problem-free alternative was unsupported by any testimony from a transportation expert or other evidence. This is not "the simple case where resumption of the former operation is little more than the old employee picking up the broom and starting to sweep where the contractor left off." *American Mfg. Co.,* 351 F.2d at 80. Restoration would require the importation of expertise not now possessed, and the coordination of a host of activities relating to the distribution of Coronet's product and the development of backhaul business that, according to Jaquith and Padden, Coronet lacks the experience and expertise to effectively handle. It would also require that Coronet locate a new terminal to house its considerably larger fleet of trucks. *See National Family Opinion, Inc.,* 246 N.L.R.B. 521 (1979) (holding that reestablishment of printing department would be unduly burdensome where restoration would require either transfer of entire department or leasing of additional space).

Although the ALJ credited the testimony of both Padden and Jaquith, the Board concluded that Coronet exaggerated the difficulty of creating an in-house operation. It suggested that people employed by LMI exclusively to serve Coronet at the Wheeling

terminal may be rehired by Coronet; that Padden could handle the backhaul business because of his previous experience (which was exaggerated by the ALJ); that Coronet would not lose any of the backhaul revenues currently generated by LMI; and that perhaps even the management needed to direct Coronet-employed drivers could be contracted-for.[14] But this is all speculative and, accordingly, "register[s] no weight on the substantial evidence scale." *Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d at 1269.

The fact remains, as Jaquith's testimony makes clear, the running of a long-haul trucking operation of this size is a complex process. Padden and Jaquith testified that restoration would both jeopardize service quality in a vital area of Coronet's business, and impose extra burdens upon its management—burdens its management lacks the time and expertise to discharge properly. The ALJ also ignored both Jaquith's and Padden's unequivocal testimony, credited by two ALJs, that, given the availability of contract packages furnished by experienced trucking firms, it made no sense for Coronet to try to construct an in-house program of its own, especially where companies like Coronet were today, for the reasons given by Jaquith, mostly giving up in-house transportation departments.[15] We do not think the Board may take an opposing view of the business realities without having more supporting evidence in the record than it has.

We think that Coronet has shown that restoration will result in undue hardship. Restoration will require Coronet to abandon contract trucking arrangements that have satisfactorily served its needs for several years in favor of building, essentially from scratch, a new and—compared to its former in-house department—essentially different, in-house transportation unit. Here the uncontroverted evidence indicates that, at the time of its improper dealings with its workers and the union, Coronet had, in fact, an inadequately structured and performing transportation department. The company's

anti-union activities occurred more or less at the time major changes were taking place in the way trucking fleets were being managed, with an apparent trend towards contract carriers replacing private fleets because of the increasing sophistication required. After Coronet entered into contract arrangements, its favorable experience fully supported Padden's judgment; they provided precisely the services Coronet desired to handle its customers. It is undisputed, moreover, that Coronet has experienced a substantial improvement in operating efficiency with LMI.

To force Coronet, at this time, to give up an arrangement that has proven itself to be highly successful would be, in our judgment, a serious and undue hardship. It would not, indeed, even constitute a restoration of the status quo, since it is clear that the kind of private fleet operation Coronet once ran is no longer viable. The ALJ referred to the leasing of equipment, tacitly accepting that Coronet would not own its own tractors and trailers, and, by the same token, was unlikely to employ its own mechanics for maintenance. Moreover, the computerized information systems now essential did not formerly exist. It follows that if Coronet is forced to reopen its transportation department, it will not be simply restoring the prior operation but will be obliged to create an entirely restructured department. To compel it to do this, where a total package contract can provide, and is providing, the very services it now wants can only be described as a punitive rather than a remedial order.

We also wonder whether and how the employees, who were terminated in 1989, will benefit from the restoration order. If we were to enforce the Board's restoration order, Coronet would be unable to restore its in-house mechanics operation to service and maintain the trucks it would have to lease; Jaquith testified that he knew of no situation in which a lessee in such circumstances would be permitted to service the trucks. It is uncontroverted, moreover, that Coronet

---

**14.** Jaquith, asked about this proposition, said he knew of no existing arrangement where contract managers directed another's employees.

**15.** The record, moreover, contains no evidence that Coronet's competitors or other firms similarly situated are successfully employing in-house transportation departments. Indeed, all the record evidence points the other way.

has no other facility to which to transfer the displaced mechanics. Consequently, there would be nothing for the former mechanics to do within the new transportation department, or elsewhere within the company. As for the drivers, it may well be, as the ALJ suggested, that Coronet will have to look to LMI or some other contract carrier to find a new cadre of drivers for its new operation. Even if the former drivers are available for employment, Padden's testimony makes clear that there are significant business reasons for contracting out Coronet's transportation services. Consequently Coronet, shortly after being forced to incur substantial expenses and spend significant management time associated with a restoration of its in-house department, likely would decide to once again close down the in-house department for legitimate business reasons. *See, e.g., Jays Foods, Inc.*, 573 F.2d at 447 (concluding that work could be re-contracted for legitimate business reasons, with the effect that discriminatees were placed on an "employment merry-go-round"). We fail to see how a restoration order would serve the purposes of the NLRA under these circumstances.

■■■■ The traditional deference to the Board's remedial orders is premised upon the appreciation that the Board has brought to bear its careful consideration and "special competence" in fashioning relief. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265–66, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). That traditional deference does not apply to Board speculation concerning business practicalities, especially where, as here, there is substantial uncontroverted evidence that detracts from its findings. As the Supreme Court has explained:

> The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Universal Camera Corp.*, 340 U.S. at 490, 71 S.Ct. 456. We conclude that the Board's restoration order is supported by neither a "fair estimate of the worth" of testimony nor

its "special competence." We accordingly decline to enforce the Board's order to restore the transportation department.

### E. *The Backpay Award*

■■■■ Coronet challenges the Board's award of backpay on three grounds discussed below. As we have noted, *supra*, the Board is expressly authorized by statute to award backpay. *See* 29 U.S.C. § 160(c). The general legitimacy of the backpay order as a means to restore the situation "as nearly as possible, to that which would have obtained but for the illegal discrimination," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), is beyond dispute. Indeed, the Supreme Court has stated that backpay is within the "empiric process of administration" Congress entrusted to the expertise of the Board. *Id.* Accordingly, we review the Board's backpay order for an abuse of the discretion lodged in the Board. *NLRB v. Williams Enters.*, 50 F.3d 1280, 1289 (4th Cir.1995).

### 1. *Tolling Backpay*

Coronet contends that the NLRB erroneously refused to toll backpay from January 1, 1990, the date when Padden became president and, according to Coronet, would have eliminated the in-house department. Alternatively, Coronet argues that the NLRB should have tolled backpay as of no later than September 30, 1991, when, faced with difficulties involving its contract transportation provider, Coronet declined to revert to an in-house arrangement, instead contracting with another outside transportation provider.

■■■ Coronet correctly asserts that backpay would toll if it could show that its employees' jobs would have been eliminated as of one of the above dates for legitimate business reasons. *See Blackburn v. Martin*, 982 F.2d 125, 129 (4th Cir.1992). The Board, however, found that Coronet failed to carry its burden on the tolling issue, and we see no basis for reversing that decision.

■■■ We emphasize, at the outset, the strong element of deference courts owe to the Board in a backpay determination. A backpay determination lacks the added ele-

ment present in the restoration issue, supra, of imposing upon a company, for a period stretching indefinitely into the future, a particular mode of doing business that could have deleterious effects on the company's survival and as to which the employer's business judgment should not be disregarded, at least in a case such as this. Backpay is the traditional remedy for the loss of employment caused by an unfair labor practice. Only in very clear circumstances should courts override the Board's findings in that area.

 Here, it is true, the ALJ in the compliance proceeding found credible Padden's statement of his intention to close the transportation department when he became president. However, the ALJ went on to conclude that that statement, "standing alone,[was not] dispositive of the issue of whether [Coronet] would have shut down the department in 1990." *Coronet Foods, Inc.,* 322 N.L.R.B. 837, 1997 WL 11274, at *6. The ALJ found that despite Padden's testimony that he intended to close the department, whether he would actually have done so under the circumstances was "too speculative a possibility to merit reliance." *Id.* The ALJ noted, among other things, that Coronet's owner, Howard Long—who had previously displayed no interest in closing the department and, in fact, had earlier invested substantial sums of money in new trucks and equipment—retained veto power over all company decisions, including whether to close the transportation department. We cannot say that the ALJ, merely because he found Padden in general to be a credible witness, was required to toll the backpay award as of January 1, 1990 based solely upon Padden's stated intention that he would have closed the department when he became president. We conclude that the Board did not abuse its discretion when it rejected Coronet's argument that backpay should be tolled as of January 1990.

 Coronet's alternative argument, that it would have closed the transportation department no later than September 30, 1991, when it contracted with a second transportation provider instead of re-assembling the in-house department, rests upon even greater speculation. The only reason that Coronet was in a position to contract with a second carrier in September 1991 was because it had illegally closed its inhouse department in May 1989. As of September 1991, Coronet had already dismantled the transportation department and dismissed its employees. The company's decision in September 1991 to contract with a second provider rather than re-assemble the in-house department it had unlawfully closed in May 1989 sheds little if any light on whether Coronet would have closed a still-existing department for legitimate reasons no later than September 30, 1991. The Board did not abuse its discretion in rejecting Coronet's alternative argument.

We reject Coronet's tolling arguments for an additional reason. The primary argument Coronet advances in support of tolling backpay—that Padden within a year or so after Coronet had illegally closed its transportation department would have done so for legitimate business reasons—is closely allied to the similar argument rejected by both the ALJ and the D.C. Circuit during the unfair labor practice proceeding. The ALJ characterized Coronet's reliance on Padden's testimony that he intended to close the department prior to May 1989 for legitimate business reasons "a sham," *Coronet Foods, Inc.,* 305 N.L.R.B. 79, 1991 WL 203802, at *64. While it is true that Padden had been elevated to president by 1990, and while our refusal to force Coronet to restore the department indicates that valid reasons besides antiunion animus would doubtless support the department's abolition, we still owe great respect to the Board's finding of pretext at the liability phase of the proceedings. Rejection of the Board's findings with respect to the tolling issue would tend to undermine these earlier, fully litigated liability determinations. For this additional reason, we conclude that the Board's refusal to toll backpay, an issue comfortably within the sphere of expertise delegated by Congress to the Board, was not an abuse of discretion.

### 2. *The Backpay Formula*

 The NLRB calculated its backpay award using the "projected earnings" formula, which bases the amount of the award on

the average pre-termination earnings of the employee. Coronet argues that this choice of formula was not supported by substantial evidence and did not take account of the changes that Coronet would have made to the department for business reasons. Instead, Coronet suggests that the NLRB should have used the "replacement earnings" formula, which calculates backpay on the basis of the wages earned by the workers who replaced the terminated employees.

The Board permissibly found that Coronet would not have made changes sufficiently drastic so as to make the projected earnings formula inappropriate. Although Coronet's transportation department had operating problems since at least 1986, Coronet took no action to remedy the problems prior to its illegal closing of the department in 1989. Thus, the Board's choice of formula is supported by the record.

█ In addition, as the NLRB noted, application of the projected earnings formula in these circumstances had practical advantages. When an employer suggests a backpay formula different from the Board General Counsel's formula, the NLRB "must determine the 'most accurate' method of determining backpay amounts." *Woodline Motor Freight, Inc.,* 305 N.L.R.B. 6, 1991 WL 204271, at *1 (1991) (citation omitted). In this case, the NLRB's formula allowed for the most accurate consideration of individual workers' pay because it took into account the fact that some of the terminated drivers, mechanics, and loaders worked overtime or received compensation for doing supplemental work, while others did not.

Further, by applying the projected earnings formula, the Board was able to avoid several difficulties that would have arisen had it tried to use the replacement earnings formula. First, it would have been difficult to determine who were the appropriate "replacement" employees because Coronet's transportation department was smaller than, and organized differently than, the outside contractor's business. The duties of the contractor's employees could reasonably be distinguished from those of Coronet's employees. Second, Coronet failed to provide information on the outside contractor's employees' wages needed to make the replacement earnings calculations. Thus, the Board's choice appears to yield the most accurate result in the circumstances.

Coronet cites two cases in which the Board opted to use a replacement earnings formula in situations such as this. *See Woodline Motor Freight, Inc.,* 305 N.L.R.B. 6, 1991 WL 204271 (1991); *Avj Graphics, Inc.,* 282 N.L.R.B. 277, 1986 WL 54255 (1986). In both of those cases, however, it was the NLRB, not the court, that chose the replacement earnings formula. In a situation such as this, "[t]he fact that the Board necessarily chose to proceed by one method rather than another hardly makes out a case of abuse of discretion." *Bagel Bakers Council v. NLRB,* 555 F.2d 304, 305 (2d Cir.1977).

### 3. *Mitigation*

█ Coronet's final argument is that the Board erred in refusing to find that three of the terminated employees—Richard Melvin, Russell Haught, and Charles Logsdon— failed to mitigate their income loss for various portions during the backpay period. The burden of proof again rests on Coronet. *See Florence Printing Co. v. NLRB,* 376 F.2d 216, 223 (4th Cir.1967) ("the defense of [willful] loss of earnings is an affirmative defense and the burden of proving it rests on the employer").

█ Employees who lose their jobs as a result of unfair labor practices must mitigate their damages by seeking interim employment after their illegal discharge. *See Phelps Dodge,* 313 U.S. at 198–200, 61 S.Ct. 845. They need not actually obtain work. *See Kawasaki Motors Mfg. Corp. v. NLRB,* 850 F.2d 524, 527 (9th Cir.1988). Rather, they must make only a "reasonable effort to obtain interim employment." *Id.; see also NLRB v. Arduini Mfg. Corp.,* 394 F.2d 420, 422–23 (1st Cir.1968) (noting that an employee seeking work is required "only to [make] reasonable exertions in this regard, [and is] not[held to] the highest standard of diligence."). The Board may resolve any doubts against Coronet. *See Madison Courier, Inc.,* 472 F.2d at 1321; *Fugazy Continental Corp.,*

276 N.L.R.B. 1334, 1985 WL 46330, at *4 (1985), *enforced,* 817 F.2d 979 (2d Cir.1987).

■ First, according to Coronet, Richard Melvin should not receive any backpay.[16] While at Coronet, Melvin worked primarily as a straight-truck driver and supplemented his income by occasionally working on the loading docks. Coronet argues that the Board erred by counting Melvin's self-employment wages and search for work outside of the trucking industry as mitigating his income loss.

■ Self-employment mitigates income loss. *See, e.g., Heinrich Motors, Inc. v. NLRB,* 403 F.2d 145, 148 (2d Cir.1968) ("It is indisputable that self-employment is an adequate and proper way for the injured employee to attempt to mitigate his loss of wages."); *Fugazy Continental Corp.,* 1985 WL 46330, at *6 ("It has long been established by the Board that self-employment is an adequate and proper way for a discriminate to attempt to mitigate loss of wages."). So can work in another industry. *See, e.g.; NLRB v. Ryder Sys., Inc.,* 983 F.2d 705, 713 (6th Cir.1993) (allowing backpay to a truck driver who took work as a painter); *Fugazy Continental Corp.,* 1985 WL 46330, at *7 (awarding backpay to a limousine driver who applied for middle management positions because "almost immediately after termination[,] ... [he] decided that he no longer wished to be a limousine driver"). *But see NHE/Freeway, Inc.,* 218 N.L.R.B. 259, 260–61 (1975) (denying backpay to a nurses aide who sought employment primarily in factories). The Board's Second Supplemental Decision and Order sets out the actions that Melvin took in order to support himself. Based on that recitation, and in light of the above legal principles, the NLRB was justified in rejecting Coronet's argument that Melvin had not sufficiently mitigated his income loss.

■ Second, Coronet suggests that Russell Haught should not recover backpay for part of the period because he failed to look for work in the trucking industry.[17] As noted above, work in another industry may mitigate damages. In addition, Haught worked as a loader and straight-truck driver for Coronet; he did not have his over-the-road driver's license until after his termination. Thus, even if Coronet's interpretation of the law were correct, Haught's failure to look for work in the trucking industry would not necessarily disqualify him from backpay. In light of the fact that Russell Haught pursued work with over fifty-three companies during the contested period, the Board was entitled to reject Coronet's argument regarding him.

■ Third, Coronet suggests that Charles Lodgsdon engaged in a "lackadaisical approach toward searching for a job [that] is hardly what the Board intended to promote by imposing a mitigation requirement on backpay claimants."[18] The record establishes that Lodgsdon never let more than one or two days go by without making a job contact. Further, he documented at least two of these contacts each week, as his unemployment insurance required him to do. The NLRB appropriately rejected Coronet's argument regarding Charles Logsdon.

■ Finally, Coronet argues that the backpay of Jerry Bane, a straight-truck driver, should be tolled as of January 1, 1992. Coronet argues that Bane's route would have been eliminated on January 1, 1992 when Coronet lost its last major customer that demanded straight-truck deliveries. The Board rejected this argument because it found that Coronet could have used Bane as a trailer truck driver even after the elimination of its straight-truck route. This finding is supported by the record. The evidence shows that Bane had the proper licenses to drive trailer trucks. Further, there is no evidence that the outside contractor who was making the straight-truck deliveries when the route was eliminated terminated its straight-truck drivers. Nor is there any in-

---

**16.** Coronet challenges Melvin's right to backpay from April 1, 1989 through March 31, 1991 and from April 1, 1991 through September 30, 1993.

**17.** Coronet challenges Haught's right to backpay from February 17, 1989 through March 31, 1990.

**18.** Coronet challenges Logsdon's right to backpay from December 6, 1988 through April 1, 1990.

dication in the record that Coronet could not or would not have utilized Bane in another capacity.[19] On this record, the Board did not abuse its discretion when it refused to toll Bane's backpay.

We decline to enforce the Second Supplemental Decision and Order issued by the Board to the extent that it orders restoration of the transportation department and enforce the Board's decision with respect to backpay against Coronet.

*SO ORDERED.*

19. Although Coronet argues in its brief that it did not have a transfer policy, Coronet did not establish that fact at the hearing before the ALJ. Indeed, the citation in Coronet's brief refers to an offer of proof made by Coronet's attorney after the ALJ refused to allow continuation of a line of questioning about Coronet's transfer policy. The ALJ rejected the proffered testimony because he found that, even if Coronet eliminated Bane's job, it would have had an obligation to reinstate him to an equivalent position when one became available. Coronet did not appeal the judge's refusal to allow the testimony, and so may not rely on its attorney's offer of proof.