PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
                                    *Petitioner,*

v.

MINING SPECIALISTS, INCORPORATED,
and its alter ego or successor; POINT
MINING, INC.,

                                    *Respondents.*

No. 02-1663

On Application for Enforcement of an
Order of the National Labor Relations Board.
(9-CA-30680)

Argued: February 25, 2003

Decided: April 24, 2003

Before WILKINSON and MOTZ, Circuit Judges, and
James P. JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

Enforcement granted by published opinion. Judge Wilkinson wrote
the opinion, in which Judge Motz and Judge Jones joined.

## COUNSEL

**ARGUED:** Erin Magee Condaras, JACKSON & KELLY, P.L.L.C.,
Charleston, West Virginia, for Mining Specialists. Joan Elizabeth
Hoyte, NATIONAL LABOR RELATIONS BOARD, Washington,
D.C., for Board. **ON BRIEF:** Daniel L. Stickler, JACKSON &

KELLY, P.L.L.C., Charleston, West Virginia, for Mining Specialists. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, Deputy Assistant General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

## OPINION

WILKINSON, Circuit Judge:

The National Labor Relations Board petitions for enforcement of an order issued against Mining Specialists, Inc., and its alter ego or successor Point Mining, Inc. The company failed to afford employees Afton Willis and Chester Murphy notice of their contractually guaranteed right to recall and failed to collectively bargain with employees over the termination of production bonuses, a mandatory subject of bargaining. The Board found that the company's reasons for its failure to comply with the collective bargaining agreement were legally insufficient. Those findings have substantial support in the record as a whole. The Board's order that the company pay back wages to Willis and Murphy and production bonuses to specified union employees shall therefore be enforced in full.

I.

Mining Specialists, Inc. ("MSI") and Point Mining, Inc. ("PMI") are mining operations located in Witcher Creek, West Virginia and Campbell's Creek, West Virginia, respectively. At all times relevant to this suit, MSI had a collective bargaining agreement, the National Bituminous Coal Wage Agreement of 1988, with the United Mine Workers of America, District 17. On July 8, 1994, the National Labor Relations Board issued a decision and order finding that PMI was an alter ego or successor of MSI and therefore also subject to the terms of the collective bargaining agreement. *Mining Specialists, Inc.*, 314 NLRB 268 (1994). That finding is not disputed here.

In its decision and order, the Board also found that PMI had violated §§ 8(a)(1) and (5) of the Labor Management Relations Act, 29

U.S.C. § 158(a), by withdrawing recognition from the union and abrogating the collective bargaining agreement. On May 2, 2000, a hearing was held before an administrative law judge to resolve two issues which prior proceedings had left open.

The first issue to be resolved at this hearing was whether the company owed backpay to employees Afton Willis, Chester Murphy, and Anthony DeMarco.[1] Willis and Murphy, along with several other union employees, were laid off from their positions as roof bolters at the MSI site in April 1991. Under the collective bargaining agreement, MSI was obligated to create a "panel" of these discharged employees and to recall, by seniority, workers from the panel as positions with the company became available. Both Willis and Murphy completed the necessary paperwork to be placed on this panel. When the first positions in the roof bolter classification became available at the PMI site on March 29, 1993, however, the PMI site was being run "nonunion." The company therefore chose to hire new employees for the roof bolter positions rather than recall Willis or Murphy. The General Counsel alleged that this was an unfair labor practice in violation of the collective bargaining agreement and that the company was therefore liable to Willis and Murphy for make-whole relief. The company did not recall Willis until March 17, 1997 and did not recall Murphy until March 10, 1997.

The second issue before the ALJ was whether PMI was liable to working unit employees for certain specified production bonuses. The General Counsel claimed that the company was liable for such bonuses because the company's president James Roy Lucas instituted a bonus program in April 1994. At that time, Lucas promised that he would pay each miner $500 for every month that the mine produced 100,000 tons of raw coal. About a month later, Lucas modified the bonus plan by promising to pay the bonus if the workers produced at least 50,000 tons of clean coal. On January 3, 1995, Lucas unilaterally announced that he was discontinuing the bonus plan. The General Counsel contended that since the company did not comply with the

---

[1]The Board subsequently found that the company had no duty to recall DeMarco because he failed to complete and submit a panel form as required by the collective bargaining agreement. That ruling is not at issue here.

terms of the collective bargaining agreement in instituting or termi-
nating the plan, it was required to pay the bonuses for the months of
October 1995, January through April 1996, and October 1996 in
which the requisite amount of coal was produced by the miners.

The ALJ found against the company on both issues. Specifically,
the ALJ ordered PMI to pay the specified backpay amounts to Mur-
phy and Willis because the company had failed to properly recall
them from the panel. The ALJ additionally found that the company
was liable for the production bonuses. On September 24, 2001, the
Board adopted the ALJ's order with only minor modifications. The
Board now seeks to enforce that order.

## II.

Prior to this proceeding, PMI entered into a stipulation with the
Board in which the company agreed to make whole employees whom
it had failed to properly recall under the collective bargaining agree-
ment. The company argues, however, that it does not owe backpay to
Afton Willis because Willis failed to seek alternate employment that
was "substantially equivalent" to his position with MSI. "Employees
who lose their jobs as a result of unfair labor practices must mitigate
their damages by seeking interim employment after their illegal dis-
charge." *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 800 (4th Cir.
1998). The company contends that by accepting a job as a truck driver
and mechanic for a rafting company, Willis purposefully removed
himself from the coal industry workforce and therefore did not suffi-
ciently mitigate his damages by attempting to secure reasonably
equivalent employment.[2]

Employees who lose their jobs or are not recalled to their positions
as a result of unfair labor practices are only required to make a "rea-
sonable effort to obtain interim employment." *Id.* (internal citation
omitted). An employee "need not exhaust all possible job leads" in
order to minimize his losses. *Lundy Packing Co.*, 286 NLRB 141, 142
(1987). So long as the employee does make reasonable efforts to

---

[2]The Board did not award backpay to Willis for the months when his
seasonal employment with the rafting company ended and he did not
seek alternate employment.

obtain suitable interim employment, the success of those efforts is irrelevant to the employer's backpay obligation. *Coronet Foods*, 158 F.3d at 800.

Moreover, once an unfair labor practice has been established, the Board has broad discretion to fashion an appropriate backpay remedy. *NLRB v. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 266 (1969). The burden is on the employer to establish any affirmative defense which would lessen the amount of backpay owed to the victims of its unlawful practices. *Coronet Foods*, 158 F.3d at 800. And any doubts arising with regard to alleged affirmative defenses are to be resolved against the employer who committed the unfair labor practice. *Id.*

PMI presented no evidence to the Board that Willis unreasonably confined his search for interim employment. The company did not question Willis about his job search. Nor did PMI provide evidence of the availability of roof bolter jobs in the area that Willis might have obtained. *Mining Specialists, Inc.*, 335 NLRB No. 101, at * 6-7 (Sept. 24, 2001). Without any evidence that Willis limited his employment search in a way that prevented him from finding suitable interim employment, the company cannot deny him backpay. Therefore the decision of the Board to award backpay to Afton Willis must be enforced.

## III.

PMI next argues that Chester Murphy is not entitled to backpay because he was incarcerated at the time that he might have been recalled. According to the company, Murphy was properly removed from the panel because any attempt to recall him would have been futile. We do not think the Board erred, however, in finding that the company was not entitled to unilaterally remove Murphy from the recall panel in derogation of the collective bargaining agreement.

As an initial matter, we note that the ALJ did not credit James Roy Lucas's testimony as to why Murphy was not sent a recall notice. The ALJ found that "Lucas did not use a panel for Point Mining, Inc. Lucas never had any intent in 1993 to contact those who had submitted panel forms. Indeed, Lucas did not contact Willis who did file a panel form and was available in 1993." We owe deference to such

witness credibility assessments. *Concrete Pipe & Products, Inc. v. Const. Laborers Pension Trust*, 508 U.S. 602, 623 (1993). And, indeed, it seems improbable that Lucas, who initially denied that a panel of workers even existed, would have sent a recall notice to Murphy even had he not been incarcerated in March 1993.

The company's argument that it was not required to send Murphy a recall notice is meritless. Under the collective bargaining agreement, notice of recall is sufficient if sent by certified mail to the employee's last known address. If the employee rejects the recall offer or "fails to respond within four calendar days after receipt of such notice or accepts [the offer] but fails to report for work in a reasonable time," the employee may be removed from the panel and will lose all seniority rights at the mine. *Mining Specialists, Inc.*, 335 NLRB No. 101, at *8. These are the only means, however, by which an employee can lose recall and seniority rights under the contract. If PMI had sent a recall notice to Murphy and he had been unable to respond or unable to report to work within a reasonable time, then he could have been properly removed from the panel. Because such notice was not sent to Murphy, however, the company cannot now speculate that he would have failed to respond to such a notice had it been given.

As the Board noted, it is probable that a notice sent to Murphy's last known address would have reached him. *Mining Specialists, Inc.*, 335 NLRB No. 101, at *11. And the company has not established that Murphy "would not have been able to accept such an offer and report to work within a reasonable period of time." *Id.* The contract does not define or delimit the phrase "reasonable time," and Murphy had the right upon receipt of a recall notice to at least request from PMI a start date six weeks later on his anticipated date of release. Further, "an offer of employment from [the company] conceivably could have served as the basis for an acceleration of Murphy's upcoming release date." *Id.* at 11-12. PMI did not fulfill its contractual obligation to send a recall notice to Murphy, and we cannot accept the company's bare supposition that Murphy would not have appropriately responded to a recall notice that it did not send. Therefore, the backpay remedy for Murphy must also be enforced.

## IV.

Lastly, PMI contends that the Board erred in concluding that the company was obligated to pay production bonuses to certain miners for six months in 1995 and 1996. PMI asserts that no valid bonus plan existed and that no liability could attach under it. Moreover, even if such a plan was created as an act of generosity by James Roy Lucas, PMI argues that the plan was terminated more than nine months before the first claim to bonus pay arose. The monetary incentives that Lucas offered to the miners, however, were a mandatory subject of bargaining. Therefore, unilateral termination of the plan was an unfair labor practice for which the employees must be made whole.

Article XXII of the National Bituminous Coal Wage Agreement of 1988 outlines the formal procedures for establishing a bonus plan. This section provides that "[b]efore any bonus plan can be installed, it shall be submitted to a vote by the Employees to be covered by the plan." Lucas did not undertake any such procedure when he unilaterally announced that if the miners produced 100,000 tons of raw coal they would each receive $500 per month. Further, under the contract, an employer seeking to institute a bonus plan must "notify the Mine Communication Committee of his intention to install a bonus plan at least sixty days prior to its planned commencement date" and "distribute a description of the plan to all active classified Employees at the mine." Lucas neither notified the Committee of his intention to install a bonus plan nor did he distribute any description of the plan to the union employees. Because this incentive program was not formally established as a bonus plan under the contract, the Board found that the plan was most aptly characterized as an "extracontractual" part of the miner's wage package. *Mining Specialists, Inc.*, 335 NLRB No. 101, at *14.

The company argues that it possessed a contractual right to unilaterally terminate any bonus plan. *See* National Bituminous Coal Wage Agreement of 1988, Art. XXII. Once the plan was properly established as an extracontractual term of employment, however, the company could not unilaterally terminate it without vitiating the collective bargaining process. Under § 8(a)(5) of the Labor Management Relations Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29

U.S.C. 158(a)(5). An employer's unilateral change in any term or condition of employment "is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal" to bargain. *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

A bonus plan that is established as compensation for services rendered is a mandatory subject of bargaining. *Laredo Coca Cola Bottling Co.*, 241 NLRB 167, 173-74 (1979). The plan here awarded bonuses to the miners on the basis of the amount of coal that they produced. It was not a gift to the miners, but was tied to job performance. The miners produced on their end, but the company backed down on its promise to reward their production. It is clear that the incentive plan was compensation for the services of the miners and a subject of mandatory bargaining. Neither the existence of the bonus nor its amount depended upon the financial health of the company or its benevolence. Any unilateral change to the existing plan was a violation of the Act for which the Board had discretion to choose a reasonable backpay remedy. The Board's order making PMI liable for production bonuses for the months that the miners produced the requisite amount of coal is reasonable and will be enforced.

## V.

For the foregoing reasons, we enforce the Board's order in its entirety.

*ENFORCED*