**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALTON H. PIESTER, LLC,

$\qquad$ *Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

$\qquad$ *Respondent.*

No. 09-1148

NATIONAL LABOR RELATIONS
BOARD,

$\qquad$ *Petitioner,*

v.

ALTON H. PIESTER, LLC,

$\qquad$ *Respondent.*

No. 09-1255

On Petition for Review and Cross-application
for Enforcement of an Order of the
National Labor Relations Board.
(11-CA-21531)

Argued: October 28, 2009

Decided: January 15, 2010

Before TRAXLER, Chief Judge, and
DUNCAN and AGEE, Circuit Judges.

Petition for review denied; cross-application for enforcement granted by published opinion. Chief Judge Traxler wrote the majority opinion, in which Judge Duncan joined. Judge Agee wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED**: Charles F. Thompson, Jr., MALONE, THOMPSON & SUMMERS, LLC, Columbia, South Carolina, for Alton H. Piester, LLC. Milakshmi V. Rajapakse, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. **ON BRIEF:** Michael D. Malone, Columbia, South Carolina, for Alton H. Piester, LLC. Meredith L. Jason, Supervisory Attorney, Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

## OPINION

TRAXLER, Chief Judge:

Alton H. Piester, LLC ("the Company") petitions this court for review of a decision of the National Labor Relations Board ("the Board") finding that the Company violated § 8(a)(1) of the National Labor Relations Act ("the Act"), *see* 29 U.S.C.A. § 158(a)(1) (West 1998). The Board cross-applies for enforcement of its order. For the reasons stated below, we deny the Company's petition for review and grant the Board's cross-application for enforcement.

I.

Section 7 of the National Labor Relations Act ("the Act") guarantees employees not only the "right to self-organization,

to form, join, or assist labor organizations, [and] to bargain collectively," but also the right "to engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C.A. § 157 (West 1998). Section 8(a)(1) implements these guarantees by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157." 29 U.S.C.A. § 158(a)(1).

The complaint in this case alleged that the Company violated § 8(a)(1) on January 13, 2007, by impliedly threatening to discharge its employees if they continued to engage in protected, concerted activity, and on April 2, 2007, by impliedly threatening to discharge—and then actually discharging—employee Darrell Chapman for engaging in protected, concerted activity. An administrative law judge dismissed the allegations, and the General Counsel filed exceptions to each of the dismissals.

The Board, acting through a two-member quorum,[1] found the following facts:

> [The Company] is a trucking company. On January, 13, 2007, the [Company's] owner, Alton Piester, announced a proposed change to its billing and bookkeeping practices regarding fuel surcharges ("the fuel surcharge change"). The change would decrease the drivers' net pay. Though many drivers protested, Piester told them that his mind was made up and that the change would proceed regardless of their objections. Piester told the objecting drivers that if they didn't like it, they could "clean out their truck and move to another job."

---

[1]We have held that the Board can delegate its authority to a panel of three members and that two members are authorized to do that panel's work with a two-member quorum. *See* 29 U.S.C.A. § 153(b) (West 1998); *Narricot Indus. v. NLRB*, No. 09-1164, 2009 WL 4016113, at *2-*4 (4th Cir. Nov. 20, 2009).

"Clean out your truck" has a special meaning for the [Company] and its drivers. A driver will typically leave personal items in a truck if he expects to use it again. Therefore, a supervisor's statement to a driver to "clean out your truck," conveys the message that the driver will no longer be operating that truck, i.e., that he is discharged.

After the January 13 meeting, and up to the time of Chapman's discharge, employees frequently complained among themselves about the fuel surcharge change. Employees also complained directly to Piester and the [Company's] secretaries, although only Chapman continued to complain to the [Company] after January. On several occasions, however, owner-operator Adger McAlister informed Piester that the drivers continued to complain among themselves about the unfairness of the fuel surcharge change.

On April 2, Chapman spoke with Derrick, the [Company's] secretary, who also had various accounting duties. Chapman repeated the complaint he (and others) had voiced about the fuel surcharge change, and asked that the surcharge change be reflected on his paycheck stub. During this conversation, Chapman spoke loudly, then went into Piester's adjoining office to further discuss his concerns. Derrick followed Chapman into the office.

Chapman reiterated to Piester the same complaint and request he made to Derrick, at which point Derrick interjected that if Chapman was unhappy working there, he "should clean out" his truck. Chapman protested that Derrick did not have authority to discharge him. Chapman became louder, got up from his chair, and stepped toward Derrick. Piester then told [Chapman] to clean out his truck, which, as

Piester acknowledged at the hearing, meant that Chapman was discharged.

Piester testified that Chapman's shouting on April 2 was the latest in a series of misconduct, and was the "last straw" in deciding to discharge him. However, Piester did not mention any prior misconduct to Chapman, and the only reason listed for Chapman's discharge on the form filed with the South Carolina Employment Security Commission was "Disorderly Conduct in office, 4-02-7." On that form, Piester directly linked Chapman's April 2 conduct to the January 13 meeting by stating that "meet 1st part of Jan 07 that fuel surcharge would be taken out due to customer didn't want share."

J.A. 234-35 (footnotes omitted).

Regarding Piester's January 13 statement that the drivers could clean out their trucks if they did not like the surcharge change, the Board noted that the ALJ had found that the drivers were engaged in protected, concerted activity that day when they protested the change and that the Company had not excepted to this finding. The Board also determined that Piester's statement constituted an implied threat to discharge the employees for their protected, concerted activity, and, that even if it meant only that the drivers were free to leave if they did not like the new system, it was still unlawfully coercive.

As for Derrick's April 2 suggestion to Chapman that he should clean out his truck if he was unhappy, the Board noted that the ALJ had found that Derrick was acting as the Company's agent when she made the statement and that the Company did not except to that finding. The Board found that the remark, like Piester's similar January 13 statement, constituted an implied threat of discharge. The Board also determined that Derrick's remark was directed at Chapman's April 2 protected activity, for reasons that the Board discussed in

detail in its analysis of the Company's discharge of Chapman. The Board found, therefore, that the statement was unlawfully coercive.

Regarding the discharge itself, the Board found that "Chapman's conduct on April 2[ ] amounted to a continuation of the earlier concerted employee complaints about the adverse change to the fuel surcharge." J.A. 237. The Board cited testimony from secretary Sherry Marntin, Piester, and Derrick in support of its finding and found that Piester, from his conversations with owner-operator McAllister, knew that the employees continued to oppose the surcharge change. The Board was not swayed by the fact that Chapman was the only driver who requested that the surcharge be shown on his pay stub. It noted that other drivers had requested that the surcharge calculation be included on worksheets showing how their pay was calculated and that Chapman's "unique" request was made in the context of his general reiteration of the shared complaint that the policy was unfair. The Board also found that Piester himself viewed Chapman's April 2 conduct as an extension of the January 13 concerted activity, as evidenced by the fact that Derrick's statement was almost identical to Piester's January 13 response and the fact that Piester linked the January 13 and April 2 events in the explanation he gave for Chapman's discharge on the South Carolina Employment Security Commission form. The Board further found that Chapman's protected conduct was a motivating or substantial factor for his discharge and that the Company had not proven that it would have discharged Chapman absent the protected, concerted activity.

Finally, the Board found that Chapman did not forfeit the Act's protection by speaking loudly to Derrick and taking a step in her direction. Applying the test set out in *Atlantic Steel Co.*, 245 N.L.R.B. 814, 816 (1979), the Board found that all four factors favored a conclusion that Chapman did not lose the protection of the Act: The incident took place in an office where no unit employee witnessed it, the subject of the dis-

cussion related to protected activity, the nature of the outburst was relatively mild and brief, and the outburst was provoked by Derrick's unlawful statement. The Board thus concluded that the Company's discharge of Chapman constituted a § 8(a)(1) violation. On that basis, the Board ordered the Company to offer Chapman full reinstatement or the substantial equivalent, as well as backpay.

## II.

The Company first argues that the Board erred in finding that Piester's statement at the January 13 meeting constituted a § 8(a)(1) violation. Although the Company does not dispute that its employees were engaged in protected, concerted action at the meeting by protesting the surcharge change, it contends that Piester's statement was merely intended to convey that he had made up his mind regarding the surcharge change and that any further complaints by the drivers would be fruitless.[2] The Company further argues that was the meaning Piester intended and that no evidence showed that anyone at the meeting interpreted it otherwise.

Section 10(e) of the Act states that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C.A. § 160(e) (West 1998). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Gen. Wood Preserving Co.*, 905 F.2d 803, 810 (4th Cir. 1990) (internal quotation marks omitted).

When an employer's actions affect conduct protected by § 7, the actions violate § 8(a)(1) if, "under all the circum-

---

[2]The Company also maintains that the Board erred in relying on Chapman's testimony, which the Company contends was perjurious. However, the Board's order reflects that it in fact did not rely on Chapman's testimony, and the Company does not explain why it believes otherwise.

stances, the employer's conduct may reasonably tend to coerce or intimidate employees." *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4th Cir. 1998) (internal quotation marks omitted). Under this objective test, "[i]t does not matter whether the particular conduct by the employer was actually coercive," *NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 180 (4th Cir. 2003), or whether the employer actually intended to coerce, *see Medeco Sec. Locks*, 142 F.3d at 747. Rather, the salient inquiry is whether the "conduct may reasonably tend to coerce or intimidate employees." *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997). Determinations concerning tendency to coerce are "essentially for the specialized experience of the" Board. *Id.* (internal quotation marks omitted). We therefore grant "considerable deference" to the Board's decisions on such matters. *Medeco Sec. Locks*, 142 F.3d at 745.

The Board has often found employers' statements to be unlawfully coercive when they have invited employees to quit their jobs in response to employees' § 7 conduct. *See, e.g.*, *House Calls, Inc.*, 304 N.L.R.B. 311, 313 (1991) (finding violation when employer told employees who protested their late paychecks that they could quit if they did not like it). Such statements have been determined to be coercive because they tend to imply that continuing to engage in protected activity is incompatible with continued employment and would be looked upon with disfavor by the employer. *See Conley v. NLRB*, 520 F.3d 629, 638-39 (6th Cir. 2008) (per curiam); *Rogers Elec., Inc.*, 346 N.L.R.B. 508, 515 (2006). We see no reason not to defer to the Board's similar conclusion here. As we have explained, the test to be applied by the Board was an objective one. Thus, neither Piester's intentions nor the reactions of those who heard his statement are dispositive.

The Company argues that the Board's decision amounts to a bright-line rule that an employer acts illegally any time he suggests that his employees can quit if they do not like an objected-to decision. The Board did not purport to base its

decision on such a broad rule, however. It simply determined that on the facts before it, where the statement was made in response to the drivers' concerted protest of the Company's new policy, the statement had the potential to coerce employees. We conclude that substantial evidence supports the Board's decision.

### III.

The Company next challenges the Board's finding that Piester's discharge of Chapman constituted a § 8(a)(1) violation. Specifically, the Company contends that no substantial evidence supported the determination that Chapman was engaged in protected, concerted activity on April 2. We disagree.

Whether particular conduct constitutes "concerted activit[y]," as that term is used in § 7 is a question for the Board's specialized expertise, and we review the Board's determination only for reasonableness. *See NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829-30 & n.7 (1984). "The term 'concerted activit[y]' is not defined in the Act but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals." *Id.* at 830. To be engaged in concerted activity, employees need not "combine with one another in any particular way." *Id.* at 835. If "a single employee, acting alone, participates in an integral aspect of a collective process," the conduct may be found to be concerted. *Id.* In this regard, a conversation involving only a speaker and a listener may constitute concerted activity. *Krispy Kreme Doughnut Corp. v. NLRB*, 635 F.2d 304, 307 (4th Cir. 1980). To do so, however, "it must appear at the very least that [the conversation] was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.'" *Id.* (quoting *Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964)). Courts have held that "[t]he lone act of a single employee is concerted if it 'stems

from' or 'logically grew' out of prior concerted activity." *NLRB v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 265 (9th Cir. 1995) (quoting *Ewing v. NLRB*, 861 F.2d 353, 361 (2d Cir. 1988)). And even if the speaker was never selected as a spokesperson, individual protests of a management decision may properly be characterized as concerted action so long as those disagreeing with the decision "considered that they had a grievance and decided, among themselves, that they would take it up with management." *Guernsey-Muskingum Elec. Coop. Inc.*, 285 F.2d 8, 12 (6th Cir. 1960); *see Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1355 (3d Cir. 1969).

As we have explained, the Company does not challenge the fact that Chapman and other drivers engaged in protected, concerted activity by collectively taking up their grievance with management at the January 13 meeting. The Company takes issue, however, with the Board's finding that Chapman's April 2 conduct amounted to a continuation of the drivers' January 13 complaints.[3]

In challenging this determination, the Company first attacks the Board's underlying factual finding that, in addition to asking that the surcharge be shown on his paycheck stub, Chapman "reiterated the shared employee complaint about the fuel surcharge change" in the Company's office on April 2. J.A. 237. We conclude that the finding is supported by substantial evidence.

The Board cited testimony from Piester, Marntin, and Derrick in finding that Chapman complained about the surcharge that day. *See* J.A. 126 (Piester's testimony that Chapman

---

[3]The Company also argues that even if Chapman was engaged in protected conduct, the Board erred in finding that he did not forfeit his protective status for engaging in egregious conduct. General Counsel argues that this issue is not properly preserved for our review. Even assuming that this issue has not been waived, however, we conclude that the Board's determination that Chapman's conduct did not lose its protected status was clearly supported by substantial evidence in the record.

"mentioned . . . the fuel surcharge situation" on April 2); J.A. 166, 167 (Marntin's testimony that Chapman "was complaining about the fuel surcharge" when he came into her office on April 2 and that he went into Piester's office and "started discussing the fuel surcharge"); J.A. 180 (Derrick's testimony that when Chapman came in on April 2, "he was complaining about the fuel surcharge and wanted it show[n] on his check stub"). The Company contends, however, that the testimony, viewed as a whole and in conjunction with Chapman's testimony, makes clear that "Chapman was not complaining on April 2 about the surcharge" but was "instead asking how his deduction was calculated and asking that the surcharge 'deduction' show up on his paycheck." Brief of Appellant, at 20-21. We disagree.

Marntin and Chapman both testified that Chapman had complained to the secretaries on multiple occasions about the surcharge change between January 13 and April 2. Marntin testified that she believed Chapman was substantially mistaken concerning the amounts being taken out of his paychecks as a result of the change:

> [Chapman], along with a couple of other drivers, had c[o]me in and complained to me about the fuel surcharge. I had recalculated the worksheet as though there was no fuel surcharge and told [Chapman] he was losing anywhere from twelve . . . to fifteen dollars . . . per load alone. I never understood . . . why he was thinking he lost between two . . . and three hundred dollars . . . until I re-examined the worksheets [and] realized he was counting a hundred percent of what the truck makes and the driver can't do that.

J.A. 165. Marntin testified that although she had repeatedly tried to explain to Chapman that the surcharge was not costing him nearly as much as he thought, he still "believed that [his]

check was down several hundred dollars" when he entered the Company office on April 2. J.A. 178.

Marntin testified that when Chapman came in, he "was complaining about the fuel surcharge. He had told [Derrick] that he was wanting it to show on his check stub." J.A. 166. Derrick also testified that when Chapman came in that day, "he was complaining about the fuel surcharge and wanted it show[n] on his check stub." J.A. 180.

Chapman's account of the complaints he made when he came in to the office on April 2 appears largely consistent with Marntin's and Derrick's testimony. He testified,

> [Marntin] was in the office . . . doing the payroll. I started talking to her about it. And I asked her if she'd pull my record up showing me how things were being paid. And . . . I said [Marntin], there's no way that that'll work. And she said, "What do you mean?", and I said, "I can't figure it out. From what you told me, this is what's happening, I can figure it up it's not working". So, . . . [Marntin] called [Derrick]. And so I walked over to [Derrick], and . . . I said, "[Derrick], just tell me how you all are doing our payroll, how you're doing the surcharge on our checks". And she said, ". . . this is how we do it". I said, "But that don't amount up to what you all is telling us that would be coming out of our checks, it don't amount up". She said, "What do you mean?" I said, "I figured it up and every time I'm figuring, I'm not coming up with that". She said, "Well, [Chapman], that's how we do it".

J.A. 94-95. Chapman testified that at that point, he went into Piester's office and told Piester: "I cannot keep making it like this right here. . . . My check is way less than what it used to be. . . . This fuel surcharge is killing us . . . . ; there's no way I can make it like that." J.A. 95 (internal quotation marks

omitted). Chapman testified that in response, Piester "got a pencil and paper out and he started doing some figuring," J.A. 96, after which Derrick walked in and told Piester that Chapman had requested that his surcharge be shown on his paycheck stub.

Piester's testimony regarding the substance of his April 2 conversation with Chapman was largely consistent with Chapman's account. He testified that on April 2, "Chapman mentioned . . . the fuel surcharge situation and I didn't have any problems with that. And I tried to explain the thing to him again." J.A. 126.

From all of this testimony, several facts are clear. First, since the January 13 meeting, Chapman had repeatedly complained, including on April 2, about what he believed to be the substantial effect that the surcharge was having on his income. Second, in the context of that protest, Chapman had been engaging in an ongoing debate with the Company concerning exactly how much was being taken from his paycheck as a result of the surcharge change. And third, as this debate continued on April 2, Chapman claimed that the Company's figures did not add up.

What is unclear is whether Chapman was asserting that the Company was taking more than Piester said on January 13 would be taken or whether he was asserting that the Company was taking more than Piester and his secretaries claimed to be taking during the ongoing debate that continued after January 13. If Chapman was making the former assertion, then it would appear that he was raising a complaint distinct from—albeit related to—the complaint raised by the drivers at the January 13 meeting. But, if he was merely rejecting the Company's claim that the change did not have as large a financial impact as he believed, then it would appear that his primary objection was the one that he and the other drivers had expressed on January 13, namely, that the surcharge change was unfair and too costly to the drivers.

In our view, none of the testimony clearly resolves this question. The best testimony for the Company would seem to be Derrick's answer to the question of whether Chapman felt the Company was "taking out more than [it] should have" from his check. J.A. 189. Derrick responded, "Yes. Yes, I believe he thought we were taking out more — he was coming up with a different figure somehow." J.A. 189-90. This answer is less than clear, however, and Piester's description of Chapman's complaints—"he mentioned . . . the fuel surcharge situation, and I didn't have any problems with that," J.A. 126—seems more consistent with the notion that Chapman had repeated the familiar shared general complaint about the surcharge.[4] Derrick's response that Chapman should clean out his truck if he was unhappy working for the Company also seems a more likely response to a reiteration of the January 13 complaint than to the complaints the Company claims Chapman was making. In the end, we conclude that this is simply a very close factual issue, and, regardless of how we would have resolved it in the first instance, substantial evidence supports the Board's finding that Chapman was reiterating the shared employee complaint.

Relying on *Manimark Corp. v. NLRB*, 7 F.3d 547 (6th Cir. 1993), the Company next argues that even if Chapman did repeat his opposition to the surcharge change in the Company's offices on April 2, his actions were not protected because he was acting only on his own behalf, not on behalf of other drivers. In *Manimark*, the court determined that an employee's action was not "concerted" within the meaning of § 7, even though the employee had raised concerns to his employer that were shared by other employees. *See Manimark*, 7 F.3d at 550-51. We do not find *Manimark* to have much bearing on the result here, however. Critical to the *Manimark* court's decision was the fact that the conversation

---

[4]And, of course, Chapman's own testimony that he told Piester, "This fuel surcharge is killing us," J.A. 95, also is more consistent with the latter interpretation.

between the employee and employer took place because the employer had summoned the employee to discuss a separate matter that affected only the employee. *See id.* at 550. After disagreeing with the employer concerning that matter, the employee brought up the unrelated complaint at issue only "as an afterthought." *Id.* Also important in *Manimark* was the fact that while the complaint at issue was one shared by other employees, there was "nothing to indicate that [the employees] had decided to act upon those" complaints. *Id.* at 551.

In contrast to *Manimark*, here it is undisputed that the drivers acted in concert in jointly protesting the surcharge change at the January 13 meeting. The narrow question for the Board, therefore, was whether Chapman's April 2 conduct was a continuation of that action. We conclude that the Board was on firm ground in finding that it was. The Board found as a fact that after the drivers jointly presented their complaints on January 13, the controversy had continued unabated prior to April 2 as the drivers continued to repeatedly discuss the surcharge among themselves and Chapman continued to complain to the secretaries and to Piester. Moreover, the Board found that Piester knew that the other drivers continued to complain about the change amongst themselves. *Cf. City Disposal Sys., Inc.*, 465 U.S. at 832 (holding that a "lone employee's invocation of a right grounded in his collective-bargaining agreement is . . . a concerted activity in a very real sense" because the employee is in effect reminding his employer of the power of the group that brought about the agreement and that could be reharnessed if the employer refuses to respect the employee's objection). In fact, evidence in the record suggested that Piester himself understood Chapman's April 2 complaints to be an extension of the January 13 concerted activity. A South Carolina Employment Security Commission form signed by Piester listed the reason for Chapman's termination as "meet 1st part of Jan 07 that fuel surcharge would be taken out due to customer didn't want share. Disorderly conduct in office, 4-2-07." J.A. 216. For all of these reasons, we believe that, even though Chapman's

continued protests were presented individually, they were reasonably understood by the Board to be a continuation of the drivers' mutual decision "to take [their grievance] up with management." *Guernsey-Muskingum Elec. Coop., Inc.*, 285 F.2d at 12; *see Hugh H. Wilson Corp.*, 414 F.2d at 1355.

We note that our conclusion is strongly supported by *Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188 (6th Cir. 1985), which reached a similar result on closely analogous facts. In that case, an employee and several of his coworkers complained to their supervisor at a meeting about several working conditions, including the fact that they were often required to work overtime on Saturdays for no pay. *See id.* at 1189. When the complaint went unaddressed, the employee reiterated his concerns regarding unpaid Saturday work on two more occasions, one about a month after the original complaint, and one about a month after that. *See id.* Subsequently, he and another employee argued heatedly when their supervisor told them that one of them would have to work the next Saturday. *See id.* at 1189-90. The employee continued to argue that employees should be paid for their Saturday work. *See id.* at 1190. The court found reasonable a Board finding that the subsequent complaints constituted a continuation of the initial joint complaints. *See id.* at 1191-92. The court found non-dispositive the fact that the employee had not been chosen by his fellow employees as a spokesman for their joint complaints and noted that although the company claimed the other employees had lost interest in the issue, the company did not present any evidence of that fact. *See id.* at 1192. Rather, the court concluded that it was sufficient to warrant protection that the employees had decided amongst themselves to bring their collective concern to management. *See id.* at 1191-92.

The Company emphasizes that Chapman's request to have the surcharge shown on his pay stub was a request that no other driver had made and that his protests were always framed in terms of how much money he personally was los-

ing. However, we conclude that it was reasonable for the Board to find these facts not dispositive. In the weeks after the January 13 meeting, the group opposition to the surcharge change had spawned a number of requests that the surcharge be shown in worksheets explaining how the drivers' wages were calculated. Chapman's request to have the surcharge shown on his pay stub was only a slight variation on those requests, and it was presented "in the context of [Chapman's] underlying complaints about the fuel surcharge change." J.A. 238. As for the fact that Chapman stated his objections in terms of the effect that it was having on his paycheck, that would at most show only that it was his concern for his own finances rather than those of the group that motivated his support for the drivers' collective position. *See Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 753 (4th Cir. 1949) (explaining that individual's personal motivation for attempting to further group action does not prevent the conduct from being protected). There was no testimony that Chapman sought a personal exemption from the surcharge change that would not have applied to the other drivers as well. We therefore conclude that the Board's decision that Chapman was engaged in protected, concerted activity on April 2 was a reasonable one.

IV.

For the foregoing reasons, we deny the Company's petition for review of the Board's order and grant the Board's cross-application for enforcement.

*PETITION FOR REVIEW DENIED;*
*CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

AGEE, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority opinion that Alton Piester's comment to "clean out your truck" on January 13 constituted

a violation of the National Labor Relations Act (NLRA) based on the standard of review applicable in this case. *See Smithfield Packing Co. v. NLRB*, 510 F.3d 507, 515 (4th Cir. 2007) ("[W]e must defer to the Board where it has chosen 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'") (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). However, I write separately because I do not agree with the majority's conclusion as to the April 2 events. In particular, I do not agree with the majority's determination that "even though [Darrell] Chapman's continued protests were presented individually, they were reasonably understood by the Board to be a continuation of the drivers' mutual decision to take their grievance up with management." *Supra* at 15-16 (internal quotations omitted). Nor do I agree with the majority that whether Chapman "was reiterating the shared employee complaint" is a "close factual issue." *Supra* at 14. The evidence in the record plainly shows, as the ALJ found, that Chapman's complaints on April 2 were directed at his own inability to calculate the fuel surcharge, not the drivers' collective dissatisfaction with imposition of the fuel surcharge in the first instance. As such, there is not substantial evidence from which to conclude that Chapman was engaged in "concerted" activity at the time of his discharge. Therefore, I respectfully dissent from that portion of the opinion holding that Chapman's discharge violated § 8(a)(1) of the NLRA.

I.

With respect to Chapman's discharge claim, the General Counsel alleged "that Chapman engaged in concerted activities with other employees for their 'mutual aid or protection'" during his discussions with Sherry Marntin, Renee Derrick, and Piester on April 2, 2007. J.A. 243. Specifically, the General Counsel argued "that Chapman's April 2 conduct was a continuation of the employee protests at the January 13 meet-

ing, and therefore protected."[1] J.A. 246. The ALJ disagreed, finding that "over time, employee discontent with the [fuel surcharge] abated" but "Chapman . . . continued to complain about" it. J.A. 245. In particular, the ALJ determined that

> [t]he credited testimony establishes that when Chapman spoke with Derrick on April 2, he was concerned that the fuel surcharge amount did not appear on his pay stub. Derrick offered an explanation. Chapman remained unsatisfied and ultimately spoke with Piester.
>
>     . . . .
>
> Chapman spoke only about his own pay and pay documents and not those of any other employee. Additionally, the record fails to establish that Chapman indicated in any way that he intended to speak on behalf of any other employees or that any other employees had asked him to act on their behalf.
>
>     . . . .
>
> The credited evidence does not establish that Chapman said anything which would lead Piester to conclude that he was continuing the earlier protest. Considering the amount of time which had elapsed, it would not be self-evident that Chapman's complaints, focused solely on his own pay documentation, actually constituted activity on behalf of other employees. I conclude that [Piester] had no reasonable basis to believe that Chapman was acting on behalf of anyone but himself.

---

[1]There is no question that, as Piester concedes and the ALJ and the Board found, the employees were engaged in protected, concerted activity when they voiced their group complaints about imposition of the fuel surcharge during the January 13, 2007 meeting.

J.A. 245-46. According to the ALJ, the two and one-half months between the January 13 meeting and Chapman's objections on April 2, combined with the lack of evidence that Piester was hostile to the employees' protest about the fuel surcharge, necessitated the conclusion that the General Counsel did not carry its "burden of showing a link between the protected activity [at the January 13 meeting] and" Chapman's discharge. J.A. 246.

It is worth noting that in reaching his conclusions the ALJ also made significant first-hand determinations of witness credibility and expressly found that Chapman's testimony did "not ring true," was not to be credited, and was not "reliable." J.A. 241. In contrast, the ALJ found that Derrick's testimony "merit[ed] the greatest confidence," and that testimony by Marntin and Piester should be credited. J.A. 245. "We owe deference to such witness credibility assessments." *NLRB v. Mining Specialists, Inc.*, 326 F.3d 602, 605 (4th Cir. 2003) (citing *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993)); *Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB*, 173 F.3d 233, 240 (4th Cir. 1999) ("An ALJ's credibility determinations should be accepted by the reviewing court absent exceptional circumstances."). The Board did not reject the credibility findings by the ALJ.

Despite the ALJ's fact and credibility determinations, the Board found that Chapman's complaints on April 2 were "a continuation of the earlier concerted employee complaints about the adverse change to the fuel surcharge." J.A. 237. The Board reached this conclusion notwithstanding its determination "that Chapman made an individualized request for a notation on his pay stub" during the April 2 meeting. J.A. 238. According to the Board, "that request was made *in the context* of his underlying complaints about the fuel surcharge change." *Id.* (emphasis added). Based on the record, I do not agree.

## II.

During the process of reviewing the entire record for substantial evidence, a reviewing court must not only consider the evidence used to support the Board's factual conclusion, but it also "*must take into account whatever in the record fairly detracts" from the Board's factfinding*. *Universal Camera*, 340 U.S. at 487-88, 71 S.Ct. 456. "When the Board purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack*, 118 S.Ct. at 829. "Courts performing substantial evidence review, therefore, must examine whether the Board considered all of the reasonable inferences compelled by the evidence in reaching its decision." *Pirelli Cable Corp.*, 141 F.3d at 514.

*Sam's Club*, 173 F.3d at 239-40 (emphasis added).

The Board (and the majority) primarily rely on testimony by Marntin and Derrick as evidence that Chapman reiterated protected group complaints made at the January meeting when he met with Marntin, Derrick, and Piester in April. Chapman's own testimony, however, aptly illustrates the particular grievance he sought to address with Marntin and Derrick on April 2:

I asked her if she'd pull my record up showing me how things were being paid. And I said, you know I said to myself, I said Sherry [Marntin], there's no way that'll work. And she said "what do you mean?", and I said, "*I can't figure it out . . . .*" And so I walked over to [Derrick] and [Derrick] and I started talking. And I said, "[Derrick], just tell me

how you all are doing our payroll, how you're doing the surcharge on our checks."

J.A. 94 (emphasis added).

Chapman then described his conversation in Piester's office this way:

She (Derrick) walks in. She sits across from where I'm sitting. I'm in front of [Piester's] desk. And she said — he asked her, he said, "What do he want?" [sic] She said, "Well he want the money that we're talking [sic] out of their check, *he wanted it shown on his check stub".* Alton repeated, "No, we can't do that". I said, "Why you can't do that? You're taking it out of our check. Why you can't show it?"

J.A. 96 (emphasis added).

According to the majority, it is "clear" that (1) Chapman repeatedly complained about the effect of the surcharge on "his income," and that (2) Chapman had been in an ongoing debate with the Company concerning the amount taken from "his paycheck." *Supra* at 13. It is patently clear from the context of the testimony, as it was to the ALJ who heard it first-hand, the gravamen of Chapman's complaint on April 2 was that he did not understand how the surcharge was being calculated (and thus how it was affecting his pay), not the fact that a surcharge was company policy.

Marntin testified that Chapman

was complaining about the fuel surcharge. He had told [Derrick] that he was wanting it to show on his check stub and she advised him she couldn't put it on his check stub due to he'd be taxed by the IRS and he couldn't be taxed on money that didn't belong to him. That wouldn't benefit him at all.

. . . .

> [Then] he had went back there and him and [Piester] had started discussing it.

J.A. 166.

From this testimony the Board excerpted Marntin's broad characterization of Chapman's complaint as being "about the fuel surcharge," J.A. 237, in total isolation from her specific description of Chapman's actual, specific complaint during his visit to the company's office. Moreover, Marntin's statement that Chapman and Piester were discussing "it" clearly refers to Chapman's desire to have the information included on his pay stub, as explained by Marntin's description of the meeting between Chapman and Piester:

> [Piester] called [Derrick] back there and told [Derrick] what [Chapman] was wanting. He was wanting the fuel surcharge to show on his checks. [Derrick] explained to [Piester], she said, "That's going to be the IRS taxing that money and," she said, "the money don't belong to [Chapman] anyway, we cannot put it on his check stubs.["]

J.A. 167-68.

Finally, the ALJ specifically asked Marntin whether Chapman said "anything about just himself or other employees as well as himself" when he "came in and he talked about his payroll and his paycheck." J.A. 178. Marntin replied "just himself." *Id.* Marntin then reiterated that Chapman "always spoke about his check."[2] J.A. 179.

---

[2]The circumstances surrounding the April 2 meeting also emphasize the individual nature of Chapman's actions. His truck had a flat tire and he was instructed to pull around and have it fixed. While it was being repaired, he took the opportunity to go to the company's office and speak

The Board likewise read Derrick's testimony out of context. She testified that Chapman "stood in between our desks and he was complaining *about the fuel surcharge* and wanted it showed [sic] on his check stub." J.A. 180 (emphasis added). The Board cited this description as evidence that Chapman was complaining about the fuel surcharge and thus making a group complaint when, in context, Derrick undoubtedly conveyed that Chapman's purpose in speaking with Derrick was to have the fuel surcharge shown on his pay stub. Derrick's description of Chapman's spontaneous meeting with Piester mirrored that of Marntin: "[Piester] called me back there to help him explain what I had already explained to [Chapman]. I explained to [Piester] why it couldn't be on his check stub and explained it again to [Chapman]." J.A. 181.

Piester's testimony is also consistent with that of Marntin and Derrick. The General Counsel called Piester as a witness and he testified as follows:

> Counsel: And when [Chapman] came in, he was talking to you about the fuel surcharge. Isn't that correct?
>
> Piester: The — yes, sir.
>
> . . . .
>
> Counsel: Isn't it true that [your affidavit] says that you were *trying to explain how it worked to him*, to Mr. Chapman? Isn't that what it says?

---

with Marntin and Derrick. The fact that Chapman came to the office to speak with the administrative personnel indicates that he did not intend to plea for rescission of the surcharge, because Piester was the only one with authority to change that policy. Chapman's impromptu meeting with Piester only occurred because Derrick was unable to resolve his pay stub issue.

Piester:    Yes sir. . . .

   . . . .

Counsel:   Isn't it true that [your affidavit], the bottom line, the last line there says *that you were trying to explain how it worked*.

Piester:    Yes.

Counsel:   How the fuel surcharge worked.

Piester:    Yes.

   . . . .

Counsel:   Okay. *Didn't he ask that it be put on the pay stub* so he could see it and figure it out?

   . . . .

Piester:    I'm not sure about that now. I'm not sure whether it was on the worksheet or the pay stub.

J.A. 30-35 (emphasis added). This testimony by Piester is utterly in accord with the testimony given by Marntin and Derrick. It shows, again, that the purpose of Chapman's requests on April 2 was to obtain further explanation of how the surcharge was being calculated and to request that it be shown on his pay stub.

The majority concludes "that substantial evidence supports the Board's finding that Chapman was reiterating the shared employee complaint" about the fuel surcharge expressed by the group at the January meeting. *Supra* at 14. But when the testimony is read in context, the Board did nothing more than

improperly "prescribe what inferences from the evidence it [would] accept and reject" and the inferences it makes are not "reasonable inferences compelled by the evidence." *Sam's Club*, 173 F.3d 239-40. The Board's observation that Chapman complained "about the fuel surcharge" is not a fair reading of the evidence and does not support the conclusion that his actions on April 2 were "a continuation of" the drivers' complaints. *Supra* at 15. In my view, the evidence compels the conclusion reached by the ALJ "that Chapman was raising a personal pay computation issue on April 2 . . . ." J.A. 236-37. By accepting the Board's unreasonable reading of the testimony out of its context, the majority fails to "take into account" the parts of the record that "fairly detracts from the Board's factfinding." *Sam's Club*, 173 F.3d at 239 (internal quotations omitted).

## III.

"There can . . . be no violation of § 8(a)(1) by the employer if there is no underlying § 7 conduct by the employee. Conduct must be both concerted and protected to fall within § 7." *Yesterday's Children, Inc. v. NLRB.*, 115 F.3d 36, 44 (1st Cir. 1997).

> Employee activity protected under section 7 of the NLRA includes "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2000). We recognize that this language is broadly-worded. However, it is not without limits. As we have noted, "[t]he purpose of the act was not to guarantee to employees the right to do as they please." *Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 752 (4th Cir. 1949)(internal citation omitted).

*TNT Logistics of N. Am., Inc. v. NLRB*, 413 F.3d 402, 406-407 (4th Cir. 2005).

The ALJ found that while there was evidence that the fuel surcharge "remained a subject of discussion among employees even at the time of Chapman's discharge in April, . . . Chapman was the only driver who still was voicing objections." J.A. 242. As explained by the ALJ:

> Chapman's protest, of course, would still be protected even if he were the lone holdout trying to rally other employees to support this cause. Indeed, an individual employee's complaints aimed at instigating group action is quintessential concerted activity.

> However, the credible evidence does not establish that Chapman was trying to enlist the support of other employees or that, on April 2, 2007, he intended to speak for anyone but himself. On that date, Chapman sought, in effect, that [Piester] treat the reduction in pay as a deduction from pay and list it on the paycheck stub. The record does not establish that any other employees wanted, or had asked for, such a change. Therefore, I conclude that Chapman was acting by himself, and not continuing the employees' January 13, 2007 concerted activity.

> Credible evidence does not establish that, on April 2, 2007, [Piester] regarded Chapman as speaking or attempting to speak for anyone other than himself. Accordingly, it is difficult to find a nexus between Chapman's discharge on that date and his protected activity several months earlier.

J.A. 242.

In reversing the ALJ's decision, the Board concluded that "Chapman's repetition of the complaint *about the fuel sur-*

*charge change* on April 2 was a continuation of earlier pro-
tected concerted activity." J.A. 238. However, this faulty
conclusion rests on the Board's erroneous determination that
Chapman's request on April 2 "was made in the context of his
underlying complaints about the fuel surcharge change." J.A.
238. Although the Board's decision is somewhat confusing on
this point, it appears to have relied on two items of evidence
when it overruled the ALJ's decision regarding "concerted
activity": (1) "that the employees continued to complain
among themselves *about the fuel surcharge* change and that
[Piester] knew of this continuing dissatisfaction," J.A. 237,
and (2) that "other employees also had requested that the fuel
surcharge information be included on their worksheets."**³** J.A.
238. The Board's reliance on this evidence as a basis that
Chapman acted with a "concerted voice" is unreasonable and
is not supported by substantial evidence.

As the majority notes, we agreed in *Krispy Kreme Dough-
nut Corp. v. NLRB*, 635 F.2d 304 (4th Cir. 1980), that con-
certed activity can occur even when it involves only a speaker
and a listener. We also explained, however, that

> [i]t will not satisfy this condition [(concerted action)]
> for Board action under Section 7 that an employee's
> complaint may be directed at working conditions
> which affect all employees; "(i)t is . . . necessary . . .
> *that the employee's actions themselves at least con-
> template such group activity* [in order to support
> Board jurisdiction]. As was explained in *Indiana
> Gear Works v. NLRB*, 371 F.2d 273, 276 (7th Cir.
> 1967), "in order to prove a concerted activity under

---

**³**Each driver receives a worksheet with his paycheck showing informa-
tion about each load he picked up, including "where [he] picked it up from
and delivered to and how many times." J.A. 158. It also shows "the rate,
. . . the fuel surcharge, and the dollar amount that the truck makes. Then
depending on what the truck makes, what percentage [the driver] makes."
*Id.*

Section 7 of the Act, *it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint*." *Pelton Casteel, Inc. v. NLRB*, 627 F.2d 23, 28 (7th Cir. 1980). This construction of the statutory language determinative of when the action of a single employee will be deemed "concerted activity" within Section 7, is illustrated by *Mushroom Transportation Company v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964):

> It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, *it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.*

635 F.2d at 307 (emphasis added).

We have also explained that

> [d]etermining whether activity is protected or not depends on a proper identification of the activity's purpose. "[I]t is not the motive of the participants that we are concerned with here but the purpose of the activity." *Id.* at 753. To be protected "*the purpose of the concerted activities must be the mutual aid or protection of the employees.*" *Id.* By contrast, "personal missions are not the sort of concerted activity which the statute protects." *Media Gen. Operations, Inc. v. NLRB*, 394 F.3d 207, 212 (4th Cir. 2005).

*TNT Logistics*, 413 F.3d at 407 (emphasis added).

As the majority explains, it was Chapman who had "repeatedly complained . . . about what he believed to be the substantial effect that the surcharge was having on *his* income." *Supra* at 13 (emphasis added). It was Chapman who "had been engaging in an ongoing debate with the Company concerning exactly how much was being taken from *his* paycheck." *Id.* (emphasis added). It was Chapman who, according to the Board, "made an *individualized request* for a notation on *his* pay stub." J.A. 238 (emphasis added). Consistent with these findings, Derrick's testimony during cross-examination by the General Counsel ably illustrates the purpose of Chapman's visit to the company office on April 2:

> Counsel: He also wanted the surcharge to be shown on the pay stubs of all the employees, isn't that correct?
>
> . . . .
>
> Derrick: He never said anything about all the employees.
>
> Counsel: Well, what did he say?
>
> Derrick: He was complaining about hisself and his paycheck.
>
> Counsel: Didn't he say that the surcharge should be put on the pay stubs?
>
> Derrick: He said that he would like it shown on his pay stub.

J.A. 190.

Other testimony shows that Chapman's complaints diverged from those of the other drivers not long after the January meeting. Derrick testified on cross-examination that "[a]

few" of the "other employees came in and complained *about [the] surcharge*" but that those complaints "only lasted for a week or two" after the January meeting. J.A. 191, 193 (emphasis added). She also testified as follows:

> Counsel: But everybody complained about — most of the employees, the drivers, did complain in some way about the surcharge.
>
> Derrick: Once[,] until I explained it to them in a better manner.
>
> Counsel: Didn't they feel that they were losing money, the employees felt that they were losing money?
>
> Derrick: At the beginning until it was explained to them correctly.

J.A. 191. Marntin likewise testified that "Chapman and Mr. Brian Smith and several other drivers" complained "[w]hen they [first] saw the deduction on their pay" in late January but that she had to explain the calculation of the surcharge to Chapman "a couple of times" because he didn't seem to understand it.[4] J.A. 173-74. Neither Marntin, Derrick, nor Piester testified that any other driver complained about how the surcharge was calculated.

Despite Marntin and Derrick's testimony, the Board found relevant the fact that "Piester, via [driver] McAlister, knew that the issue remained a concern to the employees." J.A. 237.

---

[4]Derrick agreed that Chapman and Smith "were the most vocal complainers about this surcharge" but because Smith quit the week after the surcharge was instituted, Chapman was the only driver continuing to express concerns. J.A. 191. Smith did not complain to Derrick or Marntin until after he quit. Smith said he quit "because of the fuel surcharge" and, indeed, nothing in his testimony indicates he complained to anyone at the Company about calculation of the surcharge. J.A. 62-63.

But, here again, "the issue" referenced by the Board was the drivers' resentment "about the fuel surcharge," not Chapman's continued complaints about how it was being calculated vis-à-vis his paycheck. McAlister testified that the employees talked about "it" everyday — "it" being "the increase in the surcharge" or the "money being taken out of their pay." J.A. 79-80. According to McAlister, he "told [Piester] it wasn't right for him taking the fuel surcharge out of the drivers' pay" and that it "wasn't fair." J.A. 83. But nothing in McAlister's testimony indicated that anyone besides Chapman had expressed confusion over calculation of the surcharge or wanted it shown on their pay stub.[5] As the Board acknowledges, the ALJ "found no evidence that other employees wanted or sought similar changes to their pay stubs." J.A. 237.

The Board also relied on the fact that "other employees also had requested that the fuel surcharge information be included on their worksheets," J.A. 238, to conclude that "[t]he mere fact that [the other drivers] had not additionally requested that the information be reflected on their pay stubs, does not exclude Chapman's request from the scope of protected concerted activity." *Id*. But the fact that the employees received the worksheets only bolsters the conclusion that Chapman's "purpose" on April 2 did not involve group concerns. The worksheets allowed each employee, concurrent with receipt of

---

[5]In light of my view of the record in this case, the majority's citation to *Dayton Typographic*, 778 F.2d 1188 (6th Cir. 1985), is unpersuasive. In that case the only complaint from the employees was having to work on Saturdays without pay. Here, as discussed, the evidence shows that Chapman's complaints leading to his discharge were categorically different. Even more pertinent to the finding of concerted action in *Dayton Typographic* was the fact that the company put forth no evidence showing the employees did not continue to be "interested in the Saturday work issue." *Id.* at 1192. In the case at bar, the evidence demonstrates that while the drivers continued to complain about the surcharge, none other than Chapman had continued to seek explanations of how it was calculated or asked that it be put on their pay stub.

their paycheck, to see the fuel surcharge as it pertained to their individual loads hauled. Given that the drivers had the surcharge information on their worksheets and their complaints stopped once it had been explained to them by Derrick, there was simply no evidence in the record that, despite their ongoing private grumblings "about the fuel surcharge," any driver other than Chapman was unsatisfied with, or did not understand, how the surcharge was being calculated.[6]

Not only is the purpose of Chapman's discussion with Marntin, Derrick and Piester on April 2 clear, the only evidence that Chapman intended to act on behalf of the group on April 2 came from his wholly discredited testimony that he told a another driver he had been fired "because I was talking about our money." J.A. 100. That driver expressly disputed Chapman's claim, as the ALJ noted:

> Chapman's interest in the outcome of this proceeding — he stood to regain his job with backpay — may have affected his recollection. For example, Chapman described a conversation he had with another driver on April 2, 2007, just after [Piester] discharged him. Chapman testified that he told this driver that Piester fired him "because I was talking about our money." However, according to the other driver . . . Chapman said he had been fired because "he got loud in the office."

J.A. 241. There is also no evidence in the record that any of the other drivers encouraged, endorsed or even knew about Chapman's effort on April 2 to have the fuel surcharge shown on his pay stub.

---

[6]In fact, the most reasonable inference is that the other drivers would not want surcharge information on their pay stubs because, as Derrick explained, there would be adverse tax and payroll implications to the drivers for doing so. Doing so would not be "in the interest of the employees." *Mushroom Trans. Co.*, 330 F.2d at 685.

A fair reading of the testimony as a whole shows that the drivers' continued complaints "about the fuel surcharge" is simply not the same "activity" in which Chapman was engaged on the date of his discharge. The record clearly establishes that Chapman's purpose on April 2 was to try, again, to understand for himself how the surcharge was being calculated and to have it placed on his pay stub. By accepting the Board's view that Chapman's actions on April 2 constituted "concerted protected activity," the majority effectively accepts as sufficient evidence, contrary to *Krispy Kreme*, the fact that Chapman's "individualized request for a notation on his pay stub" might "affect all employees." 635 F.2d at 307. It reaches this conclusion despite no evidence that his efforts were "for the purpose of . . . mutual aid or protection," 29 U.S.C.A. § 157 (West 1998), or "for the purpose of inducing or preparing for group action to correct a grievance or a complaint." *Krispy Kreme*, 635 F.3d at 307 (internal quotations omitted). For these reasons I find the Board's determination that Chapman was engaged in concerted action to be wholly unreasonable and I would, accordingly, reverse the Board's determination that the company violated § 8(a)(1) on April 2, 2007, either by threatening to discharge Chapman or by actually discharging him.[7]

---

[7]Given my conclusion based on the record that Chapman's complaints in April were not a continuation of the group complaints at the January meeting, I disagree with the majority's characterization of *Manimark Corp. v. NLRB*, 7 F.3d 547 (6th Cir. 1993). *See supra* at 15 (distinguishing *Manimark* because "while the complaint at issue in *Manimark* was one shared by other employees, there was 'nothing to indicate that [the employees] had decided to act upon those' complaints."). Here, not only is there no evidence showing the employees shared Chapman's complaints expressed on April 2, there is no evidence that Chapman "was acting in anyone's interest but his own on [April 2]." *Manimark*, 7 F.3d at 551.